UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LASALLE BANK NATIONAL ASSOCIATION, :
as Trustee for the benefit of the Certificateholders :
of J.P. Morgan Chase Commercial Mortgage : 08-CIV-8426 (WHP) (HBP)
Securities Trust 2007-CIBC19 Commercial :
Mortgage Pass-Through Certificates, by and : ECF CASE
through LNR Partners, Inc. as Special Servicer :
                                          :
              Plaintiff, :
                                          :
              - against - :
                                          :
CIBC Inc. :
                                          :
              Defendant. :
                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE <u>THE EXPERT TESTIMONY OF BRAD A. COHEN</u>


WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
*Attorneys for Defendant CIBC Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................... i

PRELIMINARY STATEMENT ............................................................................1

FACTS ...................................................................................................................2

DESCRIPTION OF PROFFERED TESTIMONY....................................................3

      Report § I .................................................................................................4
      Report §§ II-IV .......................................................................................4
      Report § V ................................................................................................5
      Report § VI ..............................................................................................5
      Report § VII ............................................................................................6
      Report § VIII ...........................................................................................6

      A. The Second Mortgage, Alleged Waiver of Second Mortgage Prohibition, Alleged Knowledge of Second Mortgage and Failure to Include it in the Mortgage File....................................................................................7
      B. Required Improvements and/or Reserves ...............................................10
      C. Absence of Damage Causing Material Adverse Effect ...........................10
      D. Adequate Insurance Coverage .................................................................11
      E. Knowledge of Other Proceedings ...........................................................11
      F. Construction Loan ...................................................................................11
      G. Compliance with Underwriting Standards...............................................11
      H. Representation 13.....................................................................................14
      I. Damages...................................................................................................14

      Report § IX .............................................................................................16
      Rebuttal Report § II ................................................................................17

      A.     Mr. Hallock Misconstrues the MLPA....................................17
      B.     CIBC's Underwriting................................................................18
      C.     Interim Servicing .....................................................................22
      D.     Legal Process and Title Insurance ...........................................22
      E.     The Value of the Beaver Brook Loan .....................................23

ARGUMENT...........................................................................................................23

      A. Cohen's Testimony Is Necessary and Proper ........................................23
      B. Cohen's Testimony Will Not Usurp The Fact Finder's Role ..................26
      C. Plaintiff's Remaining Arguments Are Without Merit .............................29

CONCLUSION.........................................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*AUSA Life Ins. Co. v. Dwyer*,
   899 F. Supp. 1200 (S.D.N.Y. 1995)................................................................27

*Aventis Env'tl Science USA LP v. Scotts Co.*,
   383 F. Supp. 2d 488 (S.D.N.Y. 2005)...........................................................30

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*,
   No. 99-cv-1725 (VM), 2003 WL 1878246 (S.D.N.Y. April 11, 2003)................27

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).....................................................................................1, 23

*Fiataruolo v. U.S.*,
   8 F.3d 930 (2d Cir. 1993) ..........................................................................26, 27

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................................23

*In re Rezulin Prods. Liab. Litig.*,
   309 F.Supp.2d 531 (S.D.N.Y. 2004)...............................................................24

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999).......................................................................................23

*LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*,
   No. 04 Civ 5452 (PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007)..............24

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
   No. 08 CIV-8426 (WHP) (HBP) (S.D.N.Y. Oct. 8, 2010) .........................3

*Marx & Co., Inc. v. Diner's Club, Inc.*,
   550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977) ........................29

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010).........................................................29, 30

*U.S. v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991)......................................................................28, 29

*U.S. v. Scop*,
   846 F.2d 135 (2d Cir. 1988).............................................................................29

*U.S. v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ..............................................................................24

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*,
    No. 07-cv-449 (S.D. Ohio) ............................................................................24

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*,
    No. 08-cv-01448 (D. Nev.) ...........................................................................25

## OTHER AUTHORITIES

Fed. R. Evid. 702 ......................................................................................1, 2, 23, 24

Fed. R. Evid. 704 ...............................................................................................26

## PRELIMINARY STATEMENT

Plaintiff LaSalle Bank National Association, as Trustee ("LaSalle"), moves *in limine* to preclude the testimony of Defendant CIBC Inc.'s principal expert, Brad A. Cohen, who has been designated to testify on the industry standards applicable to the Commercial Mortgage-Backed Securities ("CMBS") securitization process, as applied to the facts of this case.[1]  Plaintiff argues that Cohen would usurp the function of the fact finder, but does not seriously contend that CMBS underwriting standards, customs and practices are not complex and well above the ken of the average lay person. Indeed, CMBS are arguably so complicated that commentators have accused the participants in this multi-trillion dollar industry of not fully understanding its complexities, so much so that it almost caused the collapse of the world economy in 2008.  *See, generally, The Big Short: Inside the Doomsday Machine*, Lewis, Michael M. (W.W. Norton & Co., Inc. 2010).

Although Cohen's 28 page expert report contains a few sentences expressing his opinion as to whether CIBC breached certain representations and warranties, CIBC does not intend to offer Cohen's opinions on those ultimate issues at trial.  Rather, as more fully set forth herein, CIBC intends to elicit expert testimony from Cohen as to the CMBS industry in general, its standards, customs and practices, and request that he opine on whether CIBC complied with those standards, customs and practices, as well as its own guidelines, in underwriting the loan at issue.  Such testimony is well within the standard for expert testimony as set forth in Federal Rule of Evidence 702, *Daubert v. Merrell Dow* and its progeny.

LaSalle's contention that Cohen would usurp the jury's function by opining on matters well within the common understanding of lay juries should be seen for what it truly is: a tactical

---

[1] In its letter of November 9, 2010, Plaintiff styles its motion as one to exclude Cohen's testimony and report. Defendant, however, does not intend to offer Cohen's report into evidence in its case-in-chief.  This motion is therefore a *Daubert* motion to preclude Cohen from testifying as an expert at trial.

attempt to preclude Defendant's expert because the CMBS expert selected and disclosed by Plaintiff lied about his qualifications and Plaintiff was forced to withdraw him, leaving them without an expert on CMBS.

## **FACTS**

The current dispute has its origins in LaSalle's August 2010 motion to withdraw its expert, Timothy J. Hallock, and substitute another CMBS expert in his place.  Plaintiff requested permission to withdraw Hallock as its primary expert on CMBS after Defendant demonstrated the numerous flaws in Hallock's methodology and analysis, and his lack of appropriate credentials.  Defendant opposed Plaintiff's request to substitute a "replacement" expert on the ground that Hallock's failure to meet the requirements of FRE 702, did not entitle Plaintiff to a second bite at the apple.  Defendant also moved to preclude Plaintiff's expert on mitigation of damages, Charles E. Gibbs, because: Gibbs' investigation and methodology were unreliable; he failed to conduct an adequate investigation and relied on after-the-fact justifications; he was offering opinions outside his area of expertise, including legal conclusions; and Gibbs' personal relationships with Plaintiff and its outside counsel demonstrated that he was not an impartial expert.[2]

Judge Pauley referred those motions to this Court.  By order dated October 8, 2010, this Court allowed Plaintiff to withdraw Hallock, denied Plaintiff permission to substitute a replacement expert, and narrowed the scope of Gibbs' testimony to matters relating to secured creditors in a bankruptcy proceeding.  The Court further held that Gibbs would be allowed to opine on matters that embraced the ultimate issue surrounding Plaintiff's actions in the bankruptcy proceedings, as long as he did not usurp the jury's function in ultimately determining

---

[2]  Unlike the situations presented with respect to Hallock or Gibbs, LaSalle does not seek to exclude Cohen on the grounds that he is not qualified or that his methodology or analysis are unreliable.

whether Plaintiff's mitigation efforts were adequate.  *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 CIV-8426 (WHP) (HBP) (S.D.N.Y. Oct. 8, 2010).

Shortly thereafter, at the pre-trial conference held on October 15, 2010, LaSalle informed Judge Pauley that since "what was good for the goose was good for the gander," Plaintiff would move to exclude the testimony of CIBC's principal expert, Brad A. Cohen.  LaSalle also informed Judge Pauley of its intent to seek a limitation on the testimony of Defendant's rebuttal expert, the Honorable Francis G. Conrad (Ret.), but subsequently decided not to file such a motion.  Judge Pauley then referred the motion to this Court for disposition.  Plaintiff and Defendant submitted letter briefs dated November 9, 2010 and February 15, 2011, respectively, and argument was heard on April 21, 2011.  The Court allowed the parties the opportunity to submit supplemental briefing, specifically to address the scope of the testimony that Cohen intends to offer.

## DESCRIPTION OF PROFFERED TESTIMONY

Plaintiff seeks to preclude Cohen from testifying at trial primarily because he includes in his report, among numerous other opinions and background information on the CMBS industry and commercial mortgage underwriting, opinions which Plaintiff asserts address the ultimate issue for the fact finder, legal conclusions, and what certain parties knew.  Plaintiff also seeks to exclude Cohen because his report addresses issues concerning a purportedly "unambiguous" contract, it supposedly contradicts a statement made in one document, and the report includes a factual recitation necessary to explain the basis of his opinions.  As discussed in detail below, LaSalle's attempt to preclude Cohen from testifying on these grounds is unfounded because Cohen will not be asked to opine on whether CIBC breached the representations and warranties at issue and Plaintiff's remaining objections go to the weight, not admissibility, of his testimony. Specifically, Cohen will not opine on the following topics:

- Ultimate issues—Defendant will not seek to introduce an opinion as to the ultimate issue for the fact finder, but it reserves the right to elicit opinions that embrace such issues.

- Legal Conclusions—Defendant will not elicit testimony which constitutes a legal conclusion, unless such testimony is necessary to combat Plaintiff's introduction of evidence and/or testimony which requires its introduction at trial.

- Statement of Party's Knowledge—Defendant will not elicit testimony which states that an individual or entity knew or didn't know something (unless such party has already acknowledged this).  However, Defendant can elicit testimony as to what knowledge a party should have, given a certain set of facts and/or the workings of the CMBS industry.

- Factual Recitations—Defendant will not seek to elicit testimony from Cohen to establish facts, but it will ask Cohen to summarize facts already in evidence, and/or to assume certain facts and then to opine based on those facts.

CIBC, however, does seek to offer Cohen as an expert in the following areas:

## Report § I[3]

Initially, Cohen will set forth his qualifications, the basis of his opinion and provide a brief history of CMBS.  He will explain his background and experience in the banking and real estate industries in various capacities, including his experience underwriting loans, working as a Managing Director at UBS and running the underwriting group, developing and writing UBS' underwriting manual, interactions with B-buyers and his subsequent experience advising lenders and borrowers on loan performance issues and communicating with master servicers and special servicers.

## Report §§ II-IV

Sections II through IV of Cohen's Expert Report relate to the nature of his assignment, executive summary of his conclusions and the basis of his opinions (i.e., his qualifications and review of the file) which do not require further elaboration here.

---

[3] References to "Report § __" are to sections of the Expert Report of Brad A. Cohen, dated May 19, 2010. References to "Rebuttal Report § __" are to sections of the Rebuttal Expert Report of Brad Cohen, dated June 15, 2010.  Copies of these reports are attached as Exhibits A and B, respectively, to the accompanying Declaration of Robert C. Turner, dated May 19, 2011.

**Report § V**

Before testifying about the loan at issue, Cohen will describe the historical development of the CMBS industry, REMICs and its pivotal role in providing liquidity for commercial real estate lending.  He will also testify concerning the changes to the CMBS industry which occurred in late 2007 and beyond.

**Report § VI**

Next, Cohen will testify to the workings of the CMBS industry (i.e., how loans are originated, underwritten, aggregated, reviewed by potential investors and the securitized. In this regard, Cohen's testimony will include:

- The key players in a CMBS transaction and their respective roles in the process, including the Borrower and Lender, the Issuer, the Rating Agencies, the B-piece buyers, the Trust, the master servicer and special servicer.

- The fact that lenders typically prepare manuals documenting their underwriting and due diligence processes, and that these manuals are generally guidelines, which can change over time in response to market conditions and as approaches to risk change, and that such changes are often based on feedback from third parties, including the rating agencies and bond investors.

- The role of the MLPA and PSA in the securitization process and that the representations and warranties included in such documents are customarily negotiated among the parties.

- The creation of the Trust and the different classes or "tranches" of bonds included in such Trusts, as well as the risks associated with those different tranches, including the payment waterfall and the way in which losses are incurred by investors.

- The ratings of the bonds by the rating agencies and their respective levels of risk.

- The sale of bonds to investors—and the different classes of investors.

- The due diligence reviews generally done by investors, including the B-piece buyers and the re-underwriting of loans during this process, including site visits and evaluation of cash flows, value and loss estimates.

- The Roll-Up process—whereby the B-piece investors decide which loans to keep in the pool and which to remove—and the various roles of the participants in that process.

- The role of the servicer and special servicer once the pool of loans has been sold into the Trust and the conflict of interest that can develop between the special servicer and the Trust.

## Report § VII

After discussing CMBS in general, Cohen will then summarize the factual details that are necessary to understanding his opinions concerning the $9.5 million loan from CIBC to BBV LLC that is the subject of this lawsuit, including its origination, underwriting, CIBC's due diligence, the Loan's relative importance to the entire pool of loans that were sold to the Trust, the performance of the property after it was sold into the Trust, and the subsequent modification of the Loan by the Trust.[4]

## Report § VIII

To properly frame his expert testimony, Cohen will testify as to the purpose and effect of the MLPA and the representations and warranties contained therein, in accordance with customs, standards and practices of the CMBS industry. His testimony in this section will generally include:

- The reason for the inclusion of the "materially and adversely" language in MLPAs generally, and its role in facilitating the smooth operation of the CMBS industry by limiting repurchase demands to cases where there are demonstrable material and adverse consequences, and conversely, what would happen if purchasers could sue for repurchase for any breach—even immaterial or technical ones.

- The lack of any obligation of the loan seller to buy back loans simply because of changing market conditions or changes in a property's performance.

---

[4] Cohen will testify only about facts that are already in evidence or are the type of facts ordinarily relied upon by experts in the field. He will not attempt to introduce facts not otherwise admissible. His testimony will address these facts only to the extent that they are relevant to his analysis and opinions.

- The potential conflict of interest between special servicers and the investors in higher classes of bonds—and the incentive for special servicers to keep loans in special servicing to earn fees and postpone losses.

- The fact that MLPAs in general, and the MLPA in this case, do not allow CMBS Trusts to avoid the risks associated with commercial investing (e.g., changing market conditions) and that the offering documents contain a detailed list of the risks associated with investment in CMBS transactions—all of which are borne by the investors.

- That loan sellers are not guarantors of the performance of a particular loan/property included in the pool and that this is supported by the fact that loan documents contain carve outs for bad acts by the borrower and the risk factors specifically note that risks associated with loan and property performance are risks assumed by the investors.

- That B-buyers and investors are expected to be aware of the risks associated with their investments, and B-buyers re-underwrite the loans and generally know the risks associated with a specific property/loan.

Cohen will address whether CIBC complied with industry standards, customs and practices and its own internal guidelines as to each of the specific claims made by LaSalle, without opining on whether particular representations and warranties were breached. In particular, he will opine on the specific claims asserted by LaSalle, as follows:

A.    The Second Mortgage, Alleged Waiver of Second Mortgage Prohibition, Alleged Knowledge of Second Mortgage and Failure to Include it in the Mortgage File

1.    Cohen will explain subordinate debt and the ways in which can affect a property, including:

- How subordinate debt is typically structured with a lender and the terms upon which it is issued.

- The primary ways in which subordinate debt can affect a property, specifically its impact on cash flows and the ability to refinance the property.

2.    Cohen will testify as to the differences between such traditional subordinate debt and the purported second mortgage recorded by Gorman.  He will discuss that:

- The purported second mortgage was simply a placeholder for Gorman's sweat equity (i.e, contractor fees allegedly owed to Gorman).

-7-

- The fact that no money was ever transferred between the parties, no payments were ever made on the purported second mortgage, and that the mortgage was discharged as part of the bankruptcy reorganization demonstrate that the mortgage had no effect on the property or the loan.

- Under the existing loan documents, even if the purported second mortgage was valid, it had very limited rights and that there was no incentive for Gorman to seek to foreclose on the mortgage.

- Gorman had expressly subordinated any debt owed to him by BBV to the Loan and agreed that he would take no action against the collateral for the Loan.

- The second mortgage was "toothless," as the term is used in the industry.

- Any attempt by Gorman to foreclose on the purported second mortgage would have ensured that the loan remained full recourse to Gorman, as he would lose the limit on his personal liability contained in the loan documents.

3.     Cohen will testify that a lender cannot preclude a borrower from committing fraud if the borrower is intent on violating loan documents, addressing:

- The use of "bad-boy" carveouts to the non-recourse provision, which make the borrower and/or guarantor liable for the full extent of the loan if fraud has been committed.

- The use of special purpose entities or SPEs to ensure that the new entity does not have prior debts.

4.     Cohen will opine that the purported second mortgage did not have an effect on the property because:

- No monies were ever paid on the second mortgage.

- The second mortgage did not use cash flows from the underlying collateral that would otherwise have been available to service the Loan.

- From a financial perspective—the second mortgage did not impact the Loan sold to the Trust.

5.     Cohen will further opine that the purported second mortgage did not cause BBV to file for bankruptcy.  Rather, the circumstances which led Gorman to seek bankruptcy protection for BBV existed regardless of the second mortgage.

-8-

6.    Cohen will discuss the timing of Gorman's filing of the purported second mortgage as it relates to the Loan closing and CIBC's title search, as well as the fact that it was not industry practice to run title searches between loan closing and securitization.  In this regard, he will address the fact that:

- Investors in CMBS transactions generally know that such title searches are not usually run between loan closing and securitization, and that if this was important to them they could always demand that such searches are a requirement to closing the CMBS transaction.

- CIBC never represented that it ran title searches between closing and securitization and there is no evidence that the investors ever asked CIBC about whether it did so.

7.    Cohen will testify that secondary financing is not uncommon in the traditional lending context and that it is very unusual for lending institutions to check previous loan documents to see if a secondary financing provision was violated.  He will also testify that:

- The existence of the February 2007 second mortgage was not sufficient to put CIBC on notice that Gorman may have previously violated loan covenants.

- Once CIBC had determined that it was getting clean title (i.e., all liens and encumbrances were being discharged at closing such that the Loan was a first priority mortgage), neither CIBC's standards nor industry standards required any further review of the underlying documents relating to title to the property.

8.    Cohen will also testify that since the second mortgage was discharged in the bankruptcy reorganization, this resolved the second mortgage issue and nothing was left for CIBC to cure.

9.    Finally, he will conclude that based on the fact that CIBC was not aware of the purported second mortgage until after Gorman caused BBV to file for bankruptcy in August 2008, it was not possible for CIBC to have waived any provisions of the loan documents with respect to purported second mortgage or have included the purported second mortgage in the Mortgage Loan file.

B.    Required Improvements and/or Reserves

Cohen will testify to the purpose of including similar representations and/or warranties

concerning improvements in MLPAs and that Rep. 14 in the MLPA at issue is similar to such

provisions and is intended to ensure that:

- The loan was fully disbursed except for noted escrows and reserves and no future advances were required.

- Any requirements to make improvements had been met.

- The value of the appraisal was not impaired by any improvements that had not been made.

Cohen will also testify that:

- There were no conditions in the appraisal or the loan documents relating to improvements on the property.

- The value as set forth in the appraisal was not impaired by any improvements that were not made.

- The appraisal included an "as stabilized value" that took into account the fact that the rental income on the property would stabilize.

- The appraisal did not indicate any items of deferred maintenance

- The Property Condition Report did not mention any improvements that were awaiting completion and noted that overall condition of the property was good.

- None of the Dracut Planning & Zoning Office, Dracut Building Inspection Office or Dracut Fire Department indicated to EBI, the consultant CIBC hired to conduct the property inspection, that anything was out of the ordinary with the Property.

- The B-buyers made their own site visits before the loan was securitized where they also noted that the condition of the Property was good, and that if they were concerned about the "signs of construction" or the condition of the property, they could have, and would normally, raise such concerns with CIBC during the securitization process.

C.    Absence of Damage Causing Material Adverse Effect

Cohen will not be offering testimony on this claim as Plaintiff has withdrawn its

allegation of a breach of the relevant representation.

D.     Adequate Insurance Coverage

Cohen will not be offering testimony on this claim as Plaintiff has withdrawn its allegation of a breach of the relevant representation.

E.     Knowledge of Other Proceedings

Cohen will not be offering testimony on this claim as Plaintiff has withdrawn its allegation of a breach of the relevant representation.

F.     Construction Loan

Cohen will not be offering testimony on this claim as Plaintiff has withdrawn its allegation of a breach of the relevant representation.

G.     Compliance with Underwriting Standards

1.     As an experienced commercial real estate underwriter, Cohen will testify to the general approach to underwriting commercial loans for CMBS transactions and review the underwriting actually done by CIBC to determine whether he believes that CIBC's underwriting of this loan complied with its underwriting standards.  He will testify that CMBS underwriting generally consists of the review of 8 categories of information, including (1) Property Analysis; (2) Cash Flow Analysis; (3) Property Value; (4) Borrower Review; (5) Engineering Review; (6) Environmental Review; (7) Property Insurance Review; and (8) Title Insurance Review and discuss the various steps that lenders generally undertake with respect to this areas.

2.     Cohen will discuss the use of underwriting guidelines in the CMBS industry and how lenders often adjust these guidelines over time in response to changing market conditions.

- Cohen will opine that CIBC's underwriting manual is consistent with industry standards regarding underwriting.

- He will discuss the fact that underwriting guidelines by their very nature have to allow for the application of judgment in the loan approval process.

- He will also discuss the fact that the Prospectus Supplement which was made available to all investors specifically informed the investors that the mortgage loan sellers had each developed their own set of guidelines which were generally consistent with the overview set forth in that document, but that the sellers could and had waived certain provisions at origination where they determined that such changes did not adversely affect the mortgage loan(s).

3.      With respect to CIBC's Underwriting Manual, Cohen will testify that:

- The underwriting manual specifically states that CIBC may make changes to the manual which may be more or less restrictive.

- The guidelines are not inflexible rules that must be required in all situations regardless of the actual conditions.

4.      Cohen will opine that CIBC followed its underwriting guidelines as well as industry standards, and that in his opinion CIBC's standards did not require it to do any additional due diligence.

- As support for this opinion Cohen will discuss what due diligence CIBC did on the property (e.g., review the physical condition of the property, the current and projected financial condition of the property, analysis of cash flows, site visits, credit checks, etc.).

- Cohen will also review the due diligence CIBC did on the borrower/sponsor (e.g., checking the sponsor's experience and qualifications, the ownership structure of the borrower, performed credit searches, litigation and lien searches, contacted lending references and tenants, obtained tax returns and financial statements, among others).

5.      Cohen will also address the reasons he believes the loan ultimately went into default based on his review of the documents and testimony and that despite this occurrence the property had sufficient cash flow to satisfy its debt service payments.

6.      Cohen will also address the fact that the credit and industry conditions in 2006 and 2007 were improving and that investors were buying loans with lower debt service coverage ratios and higher loan-to-value ratios.  He will also discuss that lenders:

- Received feedback from investors in earlier CMBS transactions concerning what level of risk was acceptable to investors.

-12-

- Adjusted their lending parameters accordingly.

- That CIBC would not have been adequately able to cope with the changing market conditions if it had rigid and inflexible underwriting requirements—which would also have placed CIBC at a competitive disadvantage to other lenders.

7.      Cohen will address Plaintiff's claim that CIBC violated its underwriting standards by not requiring that the Loan be underwritten to a DSCR of 1.20x.  He will discuss that the loan was underwritten to a 1.20x DSCR on an "as stabilized basis" using a final set of projected revenues and he will explain:

- How CIBC calculated the DSCR and how it was disclosed to investors.

- How this calculation of the DSCR is different from that used to calculate the DSCR for purposes of determining whether the $400,000 seasoning reserve could be released.

- How the manner in which the loan was underwritten was disclosed to the B-buyers and to the investors as a whole—and that many pieces of information concerning CIBC's underwriting were disclosed in the Asset Summary Report and reviewed and accepted by the B-buyers.

8.      Cohen will also discuss the fact that the B-buyers who bought their certificates at a discount, and achieve a premium for the risk they undertook, conducted their own underwriting of the Loan and concluded that the Loan had a risk of default for a number of reasons, including a low DSCR.

- In this context, Cohen will also discuss what the various industry participants understand based on due diligence and re-underwriting of loans, and how such re-underwriting projections are used in the decision making process.

- He will also discuss what the B-buyers should have considered and/or known by the information contained in the re-underwriting and due diligence reports.

9.      Cohen will also discuss certain specifics with respect to the entire pool of loans and how a number of loans included in the pool were underwritten to a DSCR of less than

1.20x and how this demonstrates that the B-buyers likely did not consider a DSCR of less than 1.20x a deal breaker—given the lack of evidence of any objections.[5]

H.    Representation 13

Representation 13 is a general catchall representation covering payment defaults at the time of securitization and material defaults/breaches not covered by the subject matter of other representations.   Cohen will testify to the reasons for including catchall representations in MLPAs.  He will testify that there was no payment default at the time of securitization.

I.    Damages

1.    Cohen will address the factors that can affect the value of the underlying collateral in CMBS transactions.  He will discuss:

- How market conditions are always changing and thus the potential for a decline in a property's value or the overall loan value are always possible.

- How it is a far more likely cause of any loss after a loan is sold into a CMBS trust than breaches of representations and warranties.

- How loans in CMBS trusts are not intended for resale or trading and that the only time they are sold from the Trust is when they become non/underperforming.

- It is the investors who bear the risk of changes in market conditions.

2.    With respect to his opinion that there is no damage associated with any alleged breach, Cohen will discuss the following:

- The B-buyers were expecting a loss of approximately $719,315.

- Any significant decline in the value of the property has been market driven— based on changes in facts and circumstances after the loan was securitized.

- That LNR's own appraisal conducted after BBV filed for bankruptcy valued the property at $11.3 million at that time and projected that it would reach a "as stabilized" value of $12.1 million in 2008 and that these total were both well above the value of the loan.

---

[5] Since the issuance of Cohen's report, Plaintiff has raised many other claimed ways in which CIBC allegedly violated its underwriting standards.  Cohen will address those claimed violations as well in the context of what CIBC did and whether that constituted a departure from CIBC's underwriting standards.

- That the "as stabilized" value in LNR's appraisal validates the appraisal obtained by CIBC and used in making the Loan.

- Even a second appraisal obtained by LNR in 2008 valued the as stabilized value of the property at more than the loan, and that the decrease in value was due to the use of an increased cap rate.

- The use of an increased cap rate is consistent with a change in market conditions.

- In his opinion, it was the change in investor requirements and cap rates, and not the alleged breaches, that caused any decline in the property's value.

- LNR's own analysis and testimony supports a finding that there was no loss or damage—with cites to the testimony and analysis used to show how the Trust had not suffered any loss and how the loan modifications provided a means to avoid any loss in the future.

3.      Cohen will testify that the loan modifications gave the Trust added protections and rolled any missed payments and fees and the legal fees associated with the bankruptcy into the loan principal—thus allowing the Trust to recover its outs of pocket expenses.

- Cohen will also address the shortened maturity date and inclusion of a hard lock box to capture rents, and the priority given to debt service payments.

4.      Cohen will opine that any loss sustained in connection with the property in the future is speculative and attributable to market conditions (e.g., the collapse of the real estate market and credit crisis).

- He will also discuss the fact that it is impossible to predict today whether the value of the Property will be greater or lower than the remaining balance on the loan at maturity in 2015.

5.      He will also opine that based on his review of the pertinent documents, it is his opinion that CIBC underwrote the loan according to its underwriting guidelines and that any problems that arose were outside the scope of standard underwriting and industry norms.

**Report § IX**

In the section of his report entitled "Other Information," Cohen will address the following remaining allegations raised by Plaintiff:

      1.      Cohen will discuss the inherent conflict of interest between the B-piece buyer, who are often the special servicers, and the rest of the Trust.

- Since the B-piece buyer absorbs the first loss, any reduction in value affects it first.

- B-piece buyers can seek to recover declines in value due to market conditions by seeking to force loan sellers to repurchase a loan.

- There is little incentive for the B-buyer to refrain from filing such a lawsuit since the Trust bears the cost of the litigation, not the B-buyer—even though this may not be in the best interest of the Trust as a whole.

- He will also discuss the role of the servicer and master servicer.

      2.      Cohen will also discuss the requirement that the Trust compile monthly reports on the performance on the loans included in the Trust (the Trustee Reports) and the duty that the Trust and the servicers have to provide accurate information.

- Cohen will also note that the Trust never identified in any Trustee report prior to the filing of this lawsuit (or in any report prior to October 2010)—that there were any material breaches associated with any of the loans in the pool, let alone this Loan.

      3.      Cohen will also discuss certain statistics associated with the performance of the pool as of May 2010 (e.g., total number of loans in the pool, the total number of loans and dollar amounts in special servicing, the total number in foreclosure, REO loans and loans where appraisal reductions have been taken and note that the Loan was not one of them). Cohen may update those statistics based on the performance of the Trust up to the date of trial.

**Rebuttal Report § II**

Although Plaintiff has withdrawn Hallock as an expert, it seeks on summary judgment to discuss certain alleged deficiencies in CIBC's underwriting, including:

- That CIBC failed to obtain all required documentation and check contractor debts.

- That CIBC performed only a cursory check of bank references.

- CIBC did not review key financial records.

- That CIBC's Underwriting Used an Inflated Cash Flow Figure.

- The CIBC inappropriately used underwritten income rather than actual income and used improper vacancy rates.

- CIBC failed to investigate Gorman's business practices—in that it did not independently locate professionals familiar with Gorman and inquire into his business ethics.

- CIBC's Credit Committee approved the loan even though it later waived a closing condition that 4 month-to-month tenants sign long term leases.

- That CIBC did not check the accuracy of third-party reports (based on the claim that the property condition report noted that the property was 99% done while an e-mail from a broker notes that a portion of the retail tenant space was being built out and they were 4-6 weeks away from occupancy.

- The claim that approval was based on an inflated appraisal value.

- That CIBC failed to make its underwriters aware that Gorman had placed a second mortgage on the property prior to CIBC's closing of the Loan.

As such, Defendant will ask Cohen to address these issues and will offer at least in part testimony from Cohen consistent with the opinions contained in Section II of his rebuttal report. (Section I is merely an introduction).

A.    Mr. Hallock Misconstrues the MLPA

Since Plaintiff has withdrawn Hallock as an expert witness, Cohen will not be offering testimony on Hallock's interpretation of the MLPA.

-17-

B.      CIBC's Underwriting

As an initial matter, Cohen will testify that the MLPA requires that the loan "complied at origination, in all material respects, with all of the terms and conditions and requirements of Seller's … underwriting standards[.]"

1.      Credit History

An analysis of CIBC's evaluation of Gorman's credit history is covered in Cohen's main report and need not be separately addressed here.  To the extent it requires further elaboration, Cohen will offer testimony on the fact that CIBC obtained the Credit & Balance Sheet Certification in which it required Gorman to certify that he hadn't filed for bankruptcy in the last 20 years.  It also ran a bankruptcy search via ChoicePoint for the past 10 years—which was the standard search conducted by ChoicePoint and the industry.  If Gorman lied on the certification, this is not a failure of CIBC to follow its standards, but borrower fraud.  Cohen would also rebut any claim that Gorman's prior bankruptcy was a red flag by discussing industry practices and the fact that Gorman obtained numerous loans post the prior bankruptcy and prior to the loan from CIBC.

2.      Additional Credit Checks

Cohen will opine that the fact that CIBC received responses from only two of three credit references is not significant, as collectively the two banks to whom CIBC spoke had loans totaling $7.5 million, which constitute the substantial majority of the outstanding loans, and they both indicated that they would do business with Gorman again.

Cohen will also opine that based on his review of the documents and testimony, there is no reason to believe that the third lender would have said anything differently than the other two.

Based on this, he will opine that CIBC did not violate its standards when it did not follow-up with the third banking reference.

3.      <u>Other Borrower Information</u>

Cohen will testify that CIBC's guidelines do not impose any requirement that CIBC audit the information provided in the Credit & Balance Sheet Certification provided by the borrower and there is no requirement that CIBC check with contractor and/or trade creditors.

He will testify that CIBC did what it was required to do—talk with residential and commercial tenants, run checks to discover whether any mechanic's liens had been filed and deal with such liens at closing.

He will also testify that there was no reason to call either of the contractors whose liens were discharged at closing to check on Gorman's payment history.

4.      <u>Analysis of Property Cashflow</u>

Cohen will testify that CIBC followed its internal standards in underwriting the loan, and that it presented its underwriting, and the assumptions on which such underwriting was based, to the B-buyers prior to securitization, who then conducted their own re-underwriting of the loan.

- Cohen will note that the B-buyers used basically the same numbers that CIBC did with respect to the property's projected revenues and expenses and that the main difference between the calculations was the B-buyers use of a higher vacancy rate.

- Cohen will also note that even though the B-buyers thought the property had a lower DSCR—they still agreed to allow the property into the pool.

Cohen will testify that viewing the underwriting based on hindsight and that there is no basis to claim that CIBC's analysis was not in accordance with its own underwriting standards.

5.      <u>Property Type and History</u>

Cohen will testify that the specifics of the property, location and lack of operating history were well documented and provided to the B-buyers, whose own analysis discussed the property and its attendant risks.

6.    <u>Loans Paid Off at Closing</u>

Cohen will testify that there was no reason for CIBC to follow up with MHIC after CIBC was told that Gorman was late with his last payment as it is not uncommon for a construction loan to become delinquent as the owner waits for "take out" (permanent) financing to be arranged.

- Because developers typically refinance as construction is finishing, and it is not unusual for a loan to mature while permanent financing is being arranged.

- This is especially true where the lending reference states that it would do business with the borrower again.

- The lack of any enforcement action by MHIC is another indication that this was not a significant issue

To the extent that Plaintiff claims that CIBC should have contacted three other lenders because they were not "fully paid off" at closing, Cohen will testify that two of those "lenders" were contractors whose liens were removed at closing.  And that the third, Louis Saab, had discharged the portion of his mortgage that covered the Beaver Brook property in return for payment of $200,000; thus there was no need for CIBC to follow up with Saab.

To the extent that Plaintiff argues that there was a purported default with respect to an existing loan from Sovereign Bank, Cohen will testify that this is simply irrelevant because CIBC contacted Sovereign Bank and no reference was ever made to the default.

With respect to Plaintiff's claim that CIBC should have paid special attention to the transfer of the property from FKBE I LLC to BBV LLC, Cohen will testify:

- That this transfer was required by CIBC as part of the loan closing.

- Such transfers to newly-formed SPEs were standard in the CMBS industry.

- There was no need for CIBC to pay special attention to something that was required to happen by CIBC.

7.    Existence of Second Mortgage

Cohen will testify that the mere existence of a second mortgage would not have put a lender on notice that the mortgage violated existing loan documents and that from CIBC's perspective what was important to know about the existing mortgages (and second mortgages) and liens was that they were being discharged and that CIBC was obtaining clean title.

- He will testify that there was no requirement that CIBC review the terms of each of the prior mortgage to see if it violated prior loan covenants.

8.    Enforcement of Closing Conditions

Cohen will testify that the alleged failure to enforce certain closing conditions, namely the failure to sign existing month-to-month tenants to long-term leases was not significant because Gorman had existing relationships with these tenants.

- Although it may have been preferable to have the tenants sign long-terms leases, Cohen will opine that it was acceptable and reasonable under the circumstances for CIBC to ultimately agree that Gorman could use his "best efforts" to get the tenants to sign leases—as it was in Gorman's interest to have them sign such leases.

- As the property cash flows over time were adequate to service the debt, and some of those tenants are still at the property, this was not a departure from CIBC's underwriting standards.

9.    Property Bank Statements

Cohen will testify that obtaining bank statements and reviewing that information for consistency with other information obtained during underwriting can be a meaningful step—as it can help verify income and expense for stabilized property.

With respect to BBV, Cohen will testify that because the property had not yet stabilized there was no history of stabilized expenses and revenues—making the bank statements much less important.

Regarding Plaintiff's claim that the bank statements "showed problems at the property", Cohen will testify that it is not uncommon for smaller developers to have unsophisticated cash management systems and sometimes borrowers bounce checks, especially during the final phases of construction.

- Cohen will testify that he does not consider the information contained in these bank statements significant to the underwriting of the loan.

C.     <u>Interim Servicing</u>

To the extent Plaintiff tries to prove that Gorman's attempt to obtain the release of the seasoning reserve was improper and indicative of financial problems, Cohen will testify that Gorman's request was not sufficient to put Midland and/or CIBC on notice of any financial problems.  He will testify that borrowers often request release of reserves and no connection is drawn from such a request to the borrower's financial condition.  To the extent that Plaintiff seeks to argue that CIBC's deferral of a decision on Gorman's request was an attempt to foist a problem onto the Trust, Cohen will testify to the fact that it was common practice in the industry to reserve all decisions with respect to the collateral to the new owner when the CMBS transaction was close to closing—primarily to buyer of the loan to make the decisions going forward.  He will discuss the fact that CIBC did that in this instance.

D.     <u>Legal Process and Title Insurance</u>

Hallock misconstrued the evidence in the record to suggest that CIBC's lawyers were representing Gorman.  To the extent Plaintiff cites to letters between Gorman and the title agent, Cohen will discuss the fact that he has seen no evidence that these communications were ever shared with CIBC.

E.     The Value of the Beaver Brook Loan

Hallock tried to compute a present (2010) value for the Property/Loan by adjusting CIBC's original underwriting assumptions.  To the extent that Plaintiff seeks to adduce a similar valuation of the Loan at trial, Cohen will testify concerning the general approach taken in valuing the Loan and any problems with the methodology.  Cohen is prepared to opine that any methodology similar to Hallock's would be based on improper inputs, flawed assumptions, and a failure to account for the decline in value due to the economic collapse.

Finally, Cohen generally reserves the right to address additional matters raised by Plaintiff at trial that had not been raised by the time of Cohen's Report and Rebuttal Report.

## ARGUMENT

### A.     Cohen's Testimony Is Necessary and Proper

Plaintiff fails to cite the cornerstone legal precedent underpinning motions to preclude experts—*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).   Cohen's proffered testimony unquestionably meets the standard set by *Daubert* and its progeny for the admission of expert testimony.  *See id.* 509 U.S. at 596 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

> Rule 702, entitled "Testimony by Experts," provides as follows:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (Advisory Committee Notes).  Thus, the threshold issue to be determined is whether the subject matter of the proffered testimony is beyond the understanding of the average

lay person, and therefore appropriate for expert testimony.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).  Moreover, as the Advisory Committee Notes to Rule 702 state, "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree that particular issue without enlightenment from those having specialized understanding of the subject involved."  Fed. R. Evid. 702 (Advisory Committee's Notes).

Here, it is beyond rational dispute that the CMBS industry cannot be easily understood by the untrained layman.  The complex interactions between lenders, rating agencies, servicers, special servicers, and the myriad classes of investors in CMBS transactions fall far outside the experience of ordinary persons; certainly no layman can be expected to possess knowledge of the industry so complete that he or she would be qualified to determine the issues in this case *to the best possible degree*.  Fed. R. Evid. 702 (Advisory Committee's Notes).  Expert testimony is proper—and indeed necessary—to educate the fact finder on the roles each entity plays in the CMBS process, how various entities interact, and why and how commercial loans are underwritten and securitized.  *See U.S. v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts.  Because of their specialized knowledge, their testimony can be extremely valuable and probative.").

Plaintiff itself is well aware of the necessity of expert testimony in CMBS cases: LaSalle has repeatedly utilized experts to help explain the complexities associated with CMBS transactions.  *See, e.g., LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04 Civ. 5452 (PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007); *see also generally Wells Fargo*

*Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. 07-cv-449 (S.D. Ohio); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. 08-cv-01448 (D. Nev.);.

This case is no exception. LaSalle proffered Hallock as an expert to address the complexities of the CMBS industry, commercial loan underwriting, and compliance with the representations and warranties contained in heavily negotiated securitization documents. Although LaSalle ultimately withdrew Hallock as an expert, its decision was not prompted by a newfound belief that expert testimony was inappropriate or unnecessary.[6] Indeed, LaSalle believed that expert testimony was of such critical importance that it sought permission to substitute a "replacement" for Hallock. Thus, it would be the height of hypocrisy for Plaintiff to now claim that expert testimony is not necessary in this case—especially as they have improperly sought to evade this Court's order denying them the right to a "replacement" expert by submitting expert testimony from Plaintiff's general counsel, Thomas Nealon, despite never having designated Nealon as an expert and having withheld a substantial number of documents involving Nealon on privilege grounds.

LaSalle does not challenge Cohen's qualifications, or whether his methodology and analysis are relevant and reliable. Nor does LaSalle dispute that Cohen is eminently qualified to act as an expert witness knowledgeable on the CMBS process generally, the role of B-buyers and special servicers, commercial loan underwriting, and the import of specific actions of the parties in this case.[7] Clearly Cohen's experience with commercial underwriting and the securitization process as whole will prove invaluable to the trier of fact.

---

[6]  After Hallock's deposition revealed his questionable qualifications and unreliable methodology and analysis, LaSalle voluntarily withdrew him as an expert, ostensibly based on his misrepresentations about his qualifications—although there was no evidence that Hallock ever misrepresented anything to Plaintiff's counsel.

[7]  Cohen has been involved in the commercial real estate industry for over 25 years, was the head of underwriting and due diligence for UBS/Dillon Read Capital Management, and later the co-head of Credit and Portfolio Risk

**B.**     <u>Cohen's Testimony Will Not Usurp The Fact Finder's Role</u>

LaSalle's primary complaint is that Mr. Cohen cannot—by telling the jury what result to reach, or providing a legal definition of 'material and adverse'—usurp the role of the fact finder. LaSalle also complains that the expert report contains objectionable factual narrative that would not assist the trier of fact.  And finally, LaSalle makes multiple attacks against Mr. Cohen's conclusions.  LaSalle is incorrect on all counts.

An expert witness may render opinions on questions of fact and mixed questions of fact and law that embrace an ultimate issue to be decided by the trier of fact, so long as the opinion does not invade the province of the court or the jury.  *See* Fed. R. Evid. 704; *Fiataruolo v. U.S.*, 8 F.3d 930, 941-42 (2d Cir. 1993).  By way of illustration, the Advisory Committee to the Federal Rules offered this example:

> [T]he question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed. R. Evid. 704 (Advisory Committee Notes).

As the Judge Marrero has explained:

> Through this example, the Committee intended to demonstrate that an opinion which told the jury whether or not a party had the capacity to make a will would be inadmissible because the answer was a conclusion of law that is reserved for the jury to decide, but an opinion which discussed whether the evidence showed the party had met the three requirements necessary to adjudge that party capable of making a will was admissible because it involved questions of fact that could be established based on the expert's opinion.

---

Management.  In addition, he was an active participant in discussions with special servicers, B-piece buyers, and investors during their evaluation of the pool of loans being securitized.

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, No. 99-cv-1725 (VM), 2003 WL 1878246, at *4-*6

(S.D.N.Y. April 11, 2003) (holding that expert testimony on corporate governance and degree of

control exercised by corporate defendants was permissible although it touched on the legal issue

of veil-piercing because the expert opined on factual issues, couched his opinion in terms of the

evidence relied upon, and did not merely tell the jury how their verdict should read).

In *Fiataruolo*, the Second Circuit admonished that, where expert testimony touches on

the ultimate issue, it is necessary to "examine the proper context" before determining its ultimate

admissibility. *Id.* at 942 ("when examined the proper context, [the expert's testimony] does not

cross the line."). By "proper context," the Court was referring to the lengthy exposition of

factual circumstances and explanations that formed the foundation of the expert's opinion:

> Expert Cohen went through and explained in some detail the
> payroll checks and bank account statements, providing factual
> explanations for those procedures that were being followed at C &
> C Security. Then he offered his opinion based on those procedures
> as to whether Fiataruolo was responsible under § 6672. Cohen's
> testimony gave the jury helpful information beyond a simple
> statement on how its verdict should read. He couched his opinion
> specifically 'on the evidence that I looked at and the work that I
> did.' Thus, unlike the impermissible statements in *Scop*, Cohen's
> opinion was not a simple bald assertion of the law and was not
> designed to invade the province of the trial court.

*Id.*[8]  After considering the proper context, the Second Circuit held that an expert could testify as

to whether a defendant was a "responsible person" under the Internal Revenue Code if supported

by factual explanations and couched "specifically on the evidence that [the expert] looked at and

the work that [the expert] did." *Id.*

---

[8]  Once placed in its proper context, as amplified by this memorandum, Cohen's testimony should be admitted. But
if there is any doubt, this Court should await the District Court's decision on the pending motions for summary
judgment, which may narrow the scope or clarify the issues requiring expert testimony. *See also AUSA Life Ins. Co.
v. Dwyer*, 899 F. Supp. 1200, 1202-03 (S.D.N.Y. 1995) (although trial court found significant portions of the expert
report was likely to be found inadmissible if introduced at trial, the court denied the motion to strike because it was
"hesitant to rule in advance, and in the abstract, on the admissibility of particular pieces of evidence").

*U.S. v. Bilzerian* is not to the contrary and does not support Plaintiff's argument.  926 F.2d 1285, 1294-95 (2d Cir. 1991).  *Bilzerian* simply stands for the proposition that expert testimony "encompassing an ultimate legal *conclusion* based upon the facts of the case is not admissible."  *Id.* at 1295 (emphasis added).  CIBC has agreed that Cohen will not provide be testimony as to ultimate legal conclusions.  More precisely, he will not opine that here was no breach of any specific representation or warranty claimed by Plaintiff, or that any purported breach did not have a material and adverse effect on the underlying Loan.

The remainder of Cohen's anticipated testimony, however, is properly admissible under the standard outlined in *Bilzerian*.  Cohen is eminently qualified to assist the fact finder in navigating the complex facts of this case, much as the challenged expert in *Bilzerian* could competently testify about another complicated subject matter—securities regulation and reporting.  *Id.* at 1294 ("in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.").  Cohen can provide the background information necessary for the fact finder to understand the key players in the CMBS industry, the terms commonly used in the industry, and the commercial underwriting process generally, including the types of information commonly reviewed by an underwriter and the potentially confusing concepts at work, such as "DSCR" and "LTV."  He can describe the nature of the information CIBC reviewed in its underwriting of the Loan, the information provided to the B-buyers and whether the review process undertaken by the B-buyers in this case is similar to that of the industry as a whole.  The Court in *Bilzerian* did not exclude expert testimony regarding general background on securities regulation, filing requirements, or the particular forms involved in the regulatory process.  *Id.* at 1294.  Rather, Bilzerian's expert was simply precluded in a

motion made in the middle of trial from testifying "as to what the [securities laws] *require*." *Id.* at 1295 (emphasis added).

As the Second Circuit made in clear in *Bilzerian*, "factual *conclusions* that may . . . embrace an ultimate issue to be decided by the jury" are quite different from "*opinions* embodying legal conclusions that encroach upon the court's duty to instruct on the law." *Id.* at 1294 (emphasis added) (citing *U.S. v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir.), *cert. denied*, 434 U.S. 861 (1977)).  Here, Cohen should not be precluded from testifying about the facts of the case, or his conclusions regarding those facts which do not encroach on the roles of the Court or the jury.

## C.    Plaintiff's Remaining Arguments Are Without Merit

Plaintiff's argument that a factual narrative is an improper method of expert testimony is misplaced.  To the extent that any factual narrative appears in Cohen's report, it serves only as the foundation against which he has applied his expertise and formulated his expert opinion.  Not only is this permissible, it is *necessary*.  *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 691 F. Supp. 2d 448, 466 (S.D.N.Y. 2010) (factual narrative can be used in the expert report to justify the opinions reached by the expert).  Without being able to discuss the relevant facts, no expert could provide the fact finder with sufficient context or basis from which to evaluate his opinions.

Further, Cohen may, in the exercise of his expert judgment, opine on "what would have been customary for [a party] to expect or assume[.]"  *Id.* at 467.  Such testimony will provide the fact finder with crucial information regarding the level of knowledge typically possessed by those engaged in the CMBS process—not, as Plaintiff would have it, impermissible testimony regarding someone's state of mind.  For example, Cohen may opine on the customary assumptions that would arise out of a particular CMBS transaction or in the underwriting of a

-29-

commercial loan and the due diligence process in which a B-buyer might typically engage.  From his experience with B-buyers, Cohen can testify as to what sort of information a B-buyer might receive as part of its due diligence, and to what information the B-buyer would thus have access to.

Finally, LaSalle's remaining bases for striking Cohen's testimony go to the weight Cohen's testimony, not its overall admissibility.  LaSalle's argument that Cohen should not be permitted to interpret an unambiguous contract is a red herring since there has been no finding that the contract is unambiguous.  Accordingly, an expert opinion on industry standards and practices could very well be helpful to the fact finder.

LaSalle's attack on Cohen's opinions regarding underwriting manuals and CIBC's underwriting guidelines is based on the existence of a single paragraph in an underwriting manual which CIBC's witnesses have testified was not intended to provide a set of iron-clad procedures.  To the extent that LaSalle believes that the underwriting manual contradicts or weakens Cohen's opinion, it is free to challenge that opinion—but such a "challenge to the facts or data relied upon by [the expert] does not go to the admissibility of his testimony, but only to the weight of his testimony." *Aventis Env'tl Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005).  Vigorous cross-examination is the remedy for LaSalle's complaints, not pre-trial preclusion of Mr. Cohen's testimony. *Pension Comm.*, 691 F. Supp. 2d at 459.

**<u>CONCLUSION</u>**

As the Court instructed, Defendant has gone back through Mr. Cohen's expert report to identify the areas and opinions which it may elicit from Cohen at trial.  Each of these topics is the proper subject of expert testimony.  Plaintiff's motion should therefore be denied.

Dated: New York, New York
     May 19, 2011

                       Respectfully Submitted,

                       WINSTON & STRAWN LLP
                         /s/ Joseph A. DiBenedetto
                        Joseph A. DiBenedetto
                        Thomas J. Quigley
                        Christopher C. Costello

                       200 Park Avenue
                       New York, New York 10166
                       Tel: (212) 294-6700
                       Fax: (212) 294-4700
                       jdibenedetto@winston.com
                       tquigley@winston.com
                       cccostello@winston.com
                       *Attorneys for Defendant CIBC Inc.*

NY:1342461.1