UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

LASALLE BANK NATIONAL            :
ASSOCIATION, as Trustee
for the benefit of the          :
Certificateholders of J.P.
Morgan Chase Commercial         :      08 Civ. 8426 (WHP)(HBP)
Mortgage Securities Trust
2007-CIBC 19 Commercial Mortgage  :    ORDER
Pass-Through Certificates, by
and though LNR Partners, Inc.   :
as Special Servicer,
                                :
                Plaintiff,
                                :
    -against-
                                :
CIBC INC.,
                                :
                Defendant.
                                :
----------------------------------X


        PITMAN, United States Magistrate Judge:


I.  Introduction


        Plaintiff moves in limine for an Order precluding the

testimony of defendant's expert witness, Brad Cohen.  For the

reasons set forth below, the motion is granted in part and denied

in part.

II.  Facts

    A.  The Underlying Action

       The facts giving rise to this action are set forth in the October 17, 2011 Memorandum and Order of the Honorable William H. Pauley, III, United States District Judge, granting in part and denying in part the parties' motions for summary judgment. LaSalle Bank N.A. v. CIBC Inc., 08 Civ. 8426 (WHP), 2011 WL 4943341 (S.D.N.Y. Oct. 17, 2011) ("October 17 Decision"). Familiarity with Judge Pauley's decision is assumed.  I review the facts here only to the extent necessary for an understanding of the present dispute.

       Plaintiff LaSalle Bank N.A. ("LaSalle") brings this action as the trustee of the J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-CIBC 19 which was created pursuant to a pooling and servicing agreement dated June 14, 2007.  LaSalle asserts claims for breach of contract and breach of warranty with respect to a Mortgage Loan Purchase Agreement ("MLPA") under which J.P. Morgan Chase Commercial Mortgage Securities Corp. ("J.P. Morgan") purchased from CIBC Inc. ("CIBC") in June 2007 a mortgage and note in the amount of $9.5 million on a mixed use real estate development in Massachusetts.

2

In 2007 and again in 2010, the mortgagor had difficulty making payments under the loan, and LaSalle claimed that CIBC had breached various representations and warranties set forth in the MLPA and demanded that CIBC either repurchase the mortgage and loan or provide a substitute loan to the trust.  CIBC refused to cure and this action followed.

Judge Pauley's October 17 Decision significantly narrowed the issues.  Relevant to the present dispute is LaSalle's claim that CIBC breached three representations contained in the MLPA.  The MLPA provides that the breach of a representation is actionable only if it has a "material and adverse effect" on the property subject to the mortgage, the loan made by CIBC and sold to J.P. Morgan or the interests of the investors (collectively, the "Protected Interests").

The first representation in issue is Representation 6 which provides, in pertinent part, that the property subject to the mortgage is "free and clear of any liens, claims encumbrances, participation interests, pledges, charges or security interests . . ." and that "no Mortgage Loan is secured by the property which secures another mortgage loan other than one or more Mortgage Loans as shown on the Mortgage Loan Schedule" (Complaint ("Compl.") ¶ 41(a)).  LaSalle claims that this Representation was breached because (1) as of the date of the MLPA,

3

Beaver Brook Village LLC ("Beaver Brook") (the corporate owner of the property) had issued a second mortgage in favor of Gorman (the individual who controlled Beaver Brook) and (2) equitable liens had been granted in favor creditors of Beaver Brook and Gorman.  In his October 17 Decision, Judge Pauley found that the issuance of the second mortgage in favor of Gorman constituted a breach of Representation 6, but that there were material issues of fact as to whether the Gorman mortgage materially and adversely effected any of the Protected Interests.

The second representation in issue is Representation 14 which provides, in pertinent part, that "[t]he value of the mortgaged property relative to the value reflected in the most recent appraisal thereof is not impaired by any improvements which have not been completed" (Compl. ¶ 41(d)).  Plaintiff claims CIBC breached this representation because, among other things, costs associated with new paving in a parking lot were not included in the appraisal.  The parties dispute whether the paving work constitutes a repair or an improvement and whether the purported breach had a material and adverse effect on any of the Protected Interests.

The last representation in issue, Representation 25, provides:

> Each Mortgage Loan complied at origination, in all
> material respects, with all of the terms, conditions
> and requirements of [CIBC's] . . . underwriting stan-
> dards applicable to such Mortgage Loan and since origi-
> nation, the Mortgage Loan has been serviced in all
> material respects in a legal manner in conformance with
> [CIBC's] servicing standards.

(Compl. ¶41(h)).  LaSalle claims CIBC breached Representation 25

by, among other things, failing to speak with certain trade

creditors, failing to  adequately follow up with certain bank

references, failing to uncover Gorman's 1991 bankruptcy, failing

to obtain certain bank statements and underwriting the loan to

debt service coverage ratio[1] ("DSCR") of at least 1.20.

B.   The Cohen Reports

     CIBC retained Brad Cohen as an expert witness in this

matter.  Mr. Cohen holds a bachelor's degree in economics from

Bucknell University.  From 1982 through 2010, Mr. Cohen has held

---

[1]The debt service coverage ratio or DSCR is the quotient of
the projected cash flow divided by the sum necessary to service
the debt.  See Women's Interart Center, Inc. v. New York City
Economic Development Corp., 03 Civ. 2732 (DAB)(RLE), 2005 WL
1241919 at *15 (S.D.N.Y. May 23, 2005), aff'd, 212 F. App'x 12
(2d Cir. 2007).  Thus, a DSCR of 1.20 indicates that cash flows
are expected to be 20 per cent greater than the amount necessary
to service the debt.

a number positions in the financial services industry and has
several years' experience in commercial real estate financing.
His former employers include European American Bank, Bank Leumi
Company of New York and KPMG.

According to his May 19, 2010 Report, Mr. Cohen "was
asked to review and analyze whether [CIBC] breached specific
Representations and Warranties made by CIBC in selling a certain
mortgage loan to . . . the J.P. Morgan Chase Commercial Mortgage
Securities Trust 2007-CIBC" (Expert Report of Brad Cohen, dated
May 19, 2010 ("Cohen Report"), at 3), annexed as Exhibit A to the
Declaration of Robert C. Turner, dated May 19, 2011 ("Turner
Decl.")(Docket Item 75)).

As I previously advised counsel, Mr. Cohen's report, on
its face, suffers from a number of problems.

- First, it does not merely "embrace[]" an ultimate
  issue, see Fed.R.Evid. 704(a), it unabashedly repeat-
  edly opines on whether CIBC breached its warranties in
  a manner that materially and adversely effects the
  relevant interests (Cohen Report at 4, 16, 17, 21 and
  25, annexed as Exhibit A to Turner Decl.).

- Without any indication of an appropriate foundation, it
  speculates concerning what parties to the transaction
  knew.  For example, Mr. Cohen states "The B-piece
  buyers and other certificate holders knew very well the
  risks involved in purchasing bonds in this or any other
  CMBS transaction." (Cohen Report at 12, annexed as
  Exhibit A to Turner Decl.).

- Despite the fact that he is not a lawyer, Mr. Cohen
  repeats and assumes the truth of legal opinions ex-

pressed by CIBC's counsel.  Mr. Cohen states "I have
been advised by Winston and Strawn LLP that the second
mortgage was unenforceable.  Assuming that this is
true, the mortgage, by definition, could not have a
material adverse impact upon the Trust, and my analysis
need go no further." (Cohen Report at 13 n.6, annexed
as Exhibit A to Turner Decl.).

- It speculates on the intent of the parties to the MLPA.
  Mr. Cohen states "it is my understanding that Represen-
  tation 14, among others, was intended to . . . ."
  (Cohen Report at 16, annexed as Exhibit A to Turner
  Decl.)

- It contradicts CIBC's own documents with no basis given
  for Mr. Cohen's opinion. For example, Mr. Cohen states
  "It is clear that [CIBC's] Underwriting Manual itself
  is not meant to be a manual of ironclad rules requiring
  absolute adherence. . . . In addition, these  guide-
  lines are not inflexible 'rules' that must be applied
  in every circumstance regardless of actual conditions"
  (Cohen Report at 20, annexed as Exhibit A to Turner
  Decl.).  CIBC's Underwriting Manual actually provides
  that it "establishes the minimum underwriting stan-
  dards," that "[t]hese minimum standards must be adhered
  to," and that "CIBC expects full compliance with the
  specific requirements of th[e] Manual unless a written
  waiver has been granted" (Letter from Talcott J. Frank-
  lin, Esq. to the undersigned, dated Nov. 9, 2010 at 3
  n.10).

Nevertheless, the Cohen Report does contain some information that

would be helpful to a jury.  For example, to the extent it

describes the roles of the participants in commercial real estate

financing transaction, it contains information that is well

within Mr. Cohen's expertise and that is probably not within the

knowledge of the average juror.

In an effort to try to separate the admissible from the inadmissible, I met with counsel on April 21, 2011, identified what I thought were some of the problems with the report and directed CIBC to identify the specific opinions it would seek to elicit from Mr. Cohen at trial.  Plaintiff was also provided with an opportunity to respond to defendant's designations (Order, dated April 21, 2011 (Docket Item 64)).

Although CIBC did subsequently designate the specific matters from Mr. Cohen's May 19, 2010 report that it sought to offer, it also designated material from a "Rebuttal Expert Report" that Mr. Cohen prepared in response to an expert report submitted by plaintiff and authored Timothy Hallock (Rebuttal Expert Report of Brad Cohen, dated June 15, 2010 ("Cohen Rebuttal Report"), annexed as Exhibit B to the Turner Decl.).  CIBC's attempt to offer material from the Cohen Rebuttal Report is odd. Mr. Cohen expressly states in his Rebuttal Report that he is "issuing this rebuttal report to address some of the issues specifically raised by [plaintiff's expert] Mr. Hallock," (Cohen Rebuttal Report at 2, annexed as Exhibit B to Turner Decl.). However, in October, 2010 plaintiff unconditionally withdrew Hallock as an expert witness and was precluded from offering a substitute expert (Order, dated Oct. 8, 2010 (Docket Item 30)).

Thus, as of October 2010, there was (and there still is today) no expert testimony for Mr. Cohen to rebut.[2]

By letter dated February 6, 2012, CIBC has further limited the opinions it will attempt to elicit from Mr. Cohen to reflect the narrowing of the issues resulting from Judge Pauley's October 17, 2011 partial grant of summary judgment.

III.  Analysis

A.  Admissibility of Expert
    Testimony - Applicable Standards

In order to be admissible, expert testimony must meet both the substantive requirements and limitations of Article VII of the Federal Rules of Evidence and the procedural requirements of Fed.R.Civ.P. 26(a)(2).

Rule 702 of the Federal Rule of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

_____

[2]For reasons it does not explain, CIBC most recently refers to Cohen's Rebuttal Report as a "Supp. Report" (Letter from Thomas J. Quigley, Esq. to the undersigned, dated Feb. 6, 2012 ("Quigley Letter") at 1).  CIBC's recent effort to re-christen the Cohen Rebuttal Report, however, cannot alter its nature.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.  Bourjaily v. United States, 483 U.S. 171, 175-76 (1987).  However, "the rejection of expert testimony is the exception rather than the rule."  Advisory Committee Notes to the 2000 Amendment to Fed.R.Evid. 702; Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 185 (S.D.N.Y. 2008) (Leisure, D.J.).  "The admission of expert testimony is committed to the broad discretion of the District Court and will not be disturbed on review unless found to be 'manifestly erroneous.'"  United States v. Wexler, 522 F.3d 194, 204 (2d Cir. 2008) (internal citation omitted); accord United States v. Commey, No. 10-3705 2011 WL 6157298 at *2 (2d Cir. Dec. 13, 2011).

"To be admissible, expert testimony must be both relevant and reliable."  Feinberg v. Katz, 01 Civ. 2739 (CSH), 2007 WL 4562930 at *6 (S.D.N.Y. Dec. 21, 2007) (Haight, D.J.), citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

> As the Court explained in <u>Daubert</u>, the trial judge's task is to "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Id.</u> at 597.  In its later opinion in <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999), the Court characterized this task as "the trial judge's general 'gatekeeping' obligation."  While <u>Daubert</u> set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony, <u>Kumho</u> held that these factors might also be applicable in assessing the reliability of non-scientific testimony, depending upon "the particular circumstances of the particular case at issue." 526 U.S. at 150.
>
> In discharging its gatekeeping obligation, the trial judge . . . must first find that the proposed witness's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702.  If the court makes this finding, then "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion, provided (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case." <u>Id.</u>

<u>Feinberg v. Katz</u>, <u>supra</u>, 2007 WL 4562930 at *6-*7.  <u>See</u> <u>also</u> <u>S.E.C. v. Badian</u>, 06 Civ. 2621 (LTS), 2011 WL 4526104 at *2 (S.D.N.Y. Sept. 29, 2011) (Swain, D.J.); <u>CIT Group/Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.</u>, 09 Civ. 9861, 2011 WL 4431165 at *1-*2 (S.D.N.Y. Sept. 23, 2011) (Marrero, D.J.).

"Rule 702 is intended to ensure that the expert testimony is 'helpful to the jury in comprehending and deciding issues beyond the understanding of a layperson.'" <u>Feinberg v. Katz</u>,

supra, 2007 WL 4562930 at *7, quoting DiBella v. Hopkins, 403
F.3d 102, 121 (2d Cir. 2005).  To that end, expert testimony
describing relevant background information, such as customary and
industry practice in a given field, is frequently admissible if
it will be helpful to the jury.  See Marx & Co., v. Diners Club,
Inc., 550 F.2d 505, 508-09 (2d Cir. 1977) (testimony about "step-
by-step practices ordinarily followed . . . in shepherding a
registration statement through the SEC" is admissible "under the
same theory as testimony concerning the ordinary practices of
physicians or concerning other trade customs:  to enable the jury
to evaluate the conduct of the parties against the standards of
ordinary practice in the industry"); CIT Group/Bus. Credit, Inc.
v. Graco Fishing & Rental Tools, Inc., supra, 2011 WL 4431165 at
*3 ("[P]roposed testimony to establish prevailing customs and
practices in the commercial lending industry is relevant and
reliable and would be admissible for that purpose . . . .");
Media Sport & Arts s.r.l. v. Kinney Shoe Corp., 95 Civ. 3901
(PKL), 1999 WL 946354 at *3 (S.D.N.Y. Oct. 19, 1999) (Leisure,
D.J.) (finding "customs and practices unique to the sports
marketing industry" will be helpful to the jury).  But see Marx &
Co. v. Diners Club, Inc., supra, 550 F.2d at 509 n.11 ("Of
course, expert testimony concerning the practices of a particular
trade or business is not admissible if . . . only the jury's

12

common understanding and not the customary practices or usages
are relevant.").

However, expert testimony may not go beyond its proper
role of assisting the jury.  Although Rule 704(a) of the Federal
Rules of Evidence provides that "[a]n opinion is not objection-
able just because it embraces an ultimate issue of fact," this
does not mean that an expert is free to give testimony that
effectively tells the fact finder what conclusion to reach.

> The reasoning behind Rule 704(a) is that if a
> witness (especially an expert) provides a solid founda-
> tion and explanation on an issue for which the fact-
> finder needs assistance, the factfinder might be left
> hanging if the witness cannot cap off the testimony
> with a conclusion about the ultimate issue to which the
> expert is testifying.  Testimony is a narrative, and
> jurors can be upset and confused if a witness leaves
> them with testimony that is less than a full narrative
> -- it is like the joke without the punchline, the
> mystery without the last page.  Particularly with
> respect to experts, a conclusion on the ultimate issue
> often ties the witness's testimony together into a
> coherent whole, and as such it will be more helpful to
> state the conclusion along with the rest of the opin-
> ion.  The rule also recognizes that a distinction
> between ultimate and other issues is elusive, and that
> common-law decisions attempting to draw such a distinc-
> tion were often arbitrary and unpredictable.

3 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra,

Federal Rules of Evidence Manual § 704.02[1] at 704-3 (10th ed.

2011).  In Marx & Co., v. Diners Club, Inc., "the Second Circuit

recognized that while an expert 'may testify to an ultimate fact,

and to the practices and usages of a trade, we think care must be

taken lest [the expert] be allowed to usurp the function of the judge [or the jury].'" Highland Capital Mgmt., L.P. v. Schneider, supra, 551 F. Supp. 2d at 176-77, quoting Marx & Co. v. Diners Club, Inc., supra, 550 F.2d at 511.

> Trial courts must be careful to prevent experts from offering opinions that embody legal conclusions. See United States v. Scop, 846 F.2d 135, 139 (2d Cir. 1988). To allow such opinions would "trespass[] on the province of the jury and the trial court" by imposing the expert's view of what the law is. Fiataruolo v. United States, 8 F.3d 930, 941 (2d Cir. 1993). However, the Federal Rules of Evidence were amended over twenty years ago to allow expert witnesses to render opinions even if they "embrace[] an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704. This amendment provided trial courts with more latitude to allow experts to testify about issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that the opinions may encroach on matters of law. Thus, the Second Circuit has held that "[e]xperts may testify on . . . mixed questions of fact and law." Fiataruolo, 8 F.3d at 941.

Cary Oil Co. v. MG Ref. & Mktg., Inc., 99 Civ. 1725 (VM), 2003 WL 1878246 at *5 (S.D.N.Y. Apr. 11, 2003) (Marrero, D.J.). See also United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule, an expert's testimony on issues of law is inadmissible."); Feinberg v. Katz, supra, 2007 WL 4562930 at *7 ("An expert witness's opinion may not merely tell the jury what result to reach, and it may not usurp the trial judge's function of instructing the jury on the law." (internal quotation marks and citations omitted)); see also Marx & Co. v. Diners Club,

14

Inc., supra, 550 F.2d at 511 n.17 ("The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. [Rules 701, 702, and 403] afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . ." (citation omitted)).

In United States v. Scop, 846 F.2d 135 (2d Cir.), modified, 856 F.2d 5 (2d Cir. 1988), a criminal case in which the defendants were charged with fraudulent and manipulative securities practices, the Second Circuit endeavored to differentiate between expert testimony expressing ultimate factual conclusions, which would be admissible, and the expression of ultimate legal conclusions, which would be inadmissible:

> Had [the expert] merely testified that controlled
> buying and selling of the kind alleged here can create
> artificial price levels to lure outside investors, no
> sustainable objection could have been made.  Instead,
> [he] made no attempt to couch the opinion testimony at
> issue in even conclusory factual statements but drew
> directly upon the language of the statute and accompa-
> nying regulations concerning "manipulation" and
> "fraud". . . .  In essence, his opinions were legal
> conclusions that were highly prejudicial and went well
> beyond his province as an expert in securities trading.
> Moreover, because his opinions were calculated to
> "invade the province of the court to determine the
> applicable law and to instruct the jury as to that
> law," FAA v. Landy, 705 F.2d 624, 632 (2d Cir.) . . .
> they could not have been helpful to the jury in carry-
> ing out its legitimate functions. "The admission of
> such testimony would give the appearance that the court
> was shifting to witnesses the responsibility to decide
> the case." Marx & Co. v. Diners' Club, Inc., 550 F.2d
> 505, 510 (2d Cir.) . . . .  "It is not for witnesses to

15

                instruct the jury as to applicable principles of law,
                but for the judge."  <u>Id</u>. at 509-10.

<u>United States v. Scop</u>, <u>supra</u>, 846 F.2d at 140.

        Although the distinction between ultimate issues of
fact and ultimate issues of law is "blurry at best in many
cases," 3 Stephen A. Saltzburg, Michael M. Martin & Daniel J.
Capra, <u>Federal Rules of Evidence Manual</u> § 704.02[4] at 704-6
(10th ed. 2011), certain parameters in expert testimony are
clear.  An expert may not (1) instruct the jury as to applicable
principals of the law, <u>Marx & Co. v. Diners Club, Inc.</u>, <u>supra</u>,
550 F.2d at 509-10, (2) go beyond the scope of the witness's
expertise by rendering legal opinions interpreting contract terms
at issue, <u>Marx & Co. v. Diners Club, Inc.</u>, <u>supra</u>, 550 F.2d at
509-10, (3) state a legal conclusion as to issues of contract
formation, <u>Media Sport & Arts s.r.l. v. Kinney Shoe Corp.</u>, <u>supra</u>,
1999 WL 946354 at *3, (4) "opine as to whether certain events
constituted a material breach of [a contract]," <u>CIT Group/Bus.
Credit, Inc. v. Graco Fishing and Rental Tools, Inc.</u>, <u>supra</u>, 2011
WL 4431165 at *3, or (5) state legal conclusions as to a party's
culpability based on "inadequately explored legal criteria," 1972
Advisory Committee Notes to Fed.R.Evid. 704, or "inappropriately
drawn conclusions regarding the legal significance of various
facts," <u>In re Blech Sec. Litig.</u>, 94 Civ. 7696 (RWS), 2003 WL

16

1610775 (S.D.N.Y. Mar. 26, 2005) (Sweet, D.J.).  In addition, an expert witness may not offer testimony which merely rehashes the testimony of percipient witnesses.  United States v. Amuso  21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009) (Katz, M.J.) ("An expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge.")

Additionally, an expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses. See United States v. Scop, supra, 846 F.2d at 142; CIT Group/Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc., supra, 2011 WL 4431165 at *3; Highland Capital Mgmt., L.P. v. Schneider, supra, 551 F. Supp. 2d at 180-81; Feinberg v. Katz, supra, 2007 WL 4562930 at *6-*7; see also In re Rezulin Prod. Liab. Litig., 309 F. Supp.2d. 531, 547 (S.D.N.Y. 2004 (Kaplan, D.J.) ("Inferences about the intent or

motive of parties or others lie outside the bounds of expert testimony.").

An expert may (1) engage in a "factual discussion regarding the customs and practices of [an] industry, an analysis of whether the conduct of the parties . . . conformed to those customs, and whether such behavior evidences the parties' intent to be bound by contract," Media Sport & Arts s.r.l. v. Kinney Shoe Corp., supra, 1999 WL 946354 at *3, and (2) in cases involving a complex legal concept, such as veil-piercing, analyze the evidence and identify how such evidence may indicate that the relationship between the defendants "exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing," Cary Oil Co. v. MG Ref. & Mktg., Inc., supra, 2003 WL 1878246 at *5.  Such an analysis would not "cross the boundaries into an opinion that would tell the jury what decision to reach."  Cary Oil Co. v. MG Ref. & Mktg., Inc., supra, 2003 WL 1878246 at *5.  One case has also held that an expert may testify concerning "what would have been customary for [a party] to expect or assume, [but] not what [the party] actually did expect or assume."  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Secs., LLC, 691 F. Supp. 2d 448, 467 (S.D.N.Y. 2010) (Scheindlin, D.J.).

Finally, although it is generally true that "an expert's testimony on issues of law is inadmissible," United States v. Bilzerian, supra, 926 F.2d 1285 at 1294, the Second Circuit has found testimony on an ultimate legal issue to be admissible and proper in a very limited circumstance.

> In [Fiataruolo v. United States], in which the plaintiffs sought a refund of tax penalties that had been assessed against them by the government, the Second Circuit held that the district court had not abused its discretion in allowing a certified public accountant to testify that one of the plaintiffs was not a "responsible person" under 26 U.S.C. § 6672, i.e. that he was not responsible for the payment of taxes. In so ruling, the Court of Appeals noted that
>
> > Expert Cohen went through and explained in some detail the payroll checks and bank account statements, providing factual explanations for those procedures that were being followed at C & C Security. Then he offered his opinion based on those procedures as to whether Fiataruolo was responsible under § 6672. Cohen's testimony gave the jury helpful information beyond a simple statement on how its verdict should read. He couched his opinion specifically "on the evidence that I looked at and the work that I did." Thus, unlike the impermissible statements in Scop, Cohen's opinion was not a simple bald assertion of the law and was not designed to invade the province of the trial court. Cf. Karns v. Emerson Elec. Co., 817 F.2d 1452, 1459 (10th Cir. 1987) (finding admissible testimony of expert who "explained the bases for his opinions in sufficient detail to permit the jury to independently evaluate his conclusions"); United States v. Milton, 555 F.2d 1198, 1204 (5th Cir. 1977) (finding admissible similar testimony that combined factual explanations and legal conclusions).

> <u>Id</u>. at 942.  Noting that the trial court admonished the jury that the expert's views were "not binding," the court stated that "the instruction adequately protected against the jury's giving undue weight to Cohen's opinion." <u>Id.</u>

<u>Bausch & Lomb, Inc. v. Alcon Labs., Inc.</u>, 79 F. Supp. 2d 252, 257 (W.D.N.Y. Jan. 5, 2000), <u>quoting</u> <u>Fiataruolo v. United States</u>, 8 F.3d 930, 942 (2d Cir. 1993); <u>see</u> <u>also</u> <u>Cary Oil Co. v. MG Ref. & Mktg., Inc.</u>, <u>supra</u>, 2003 WL 1878246 at *5.

In addition to the foregoing requirements, expert testimony is subject to certain procedural requirements. Fed.R.Civ.P. 26(a)(2) provides that if a party that intends to call an expert at trial, the witness must be identified in a disclosure prior to trial and

> this disclosure must be accompanied by a written report -- prepared and signed by the witness -- if the witness is one retained or specially employed to provide expert testimony in the case . . . .  The report must contain:
>
> > (i)   a complete statement of all opinions the witness will express and the basis and reasons for them;
> >
> > (ii)  the facts or data considered by the witness in forming them;
> >
> > (iii) any exhibits that will be used to summarize or support them . . . .

The expert's report operates to limit the scope of the testimony that can be elicited from the expert.  Opinions that are not disclosed in the expert's report cannot be offered.

> An expert cannot testify on a matter not disclosed
> in his preliminary report.  That report must state "the
> testimony the witness is expected to present during
> direct examination."  1993 Amendments to Fed.R.Civ.P.
> 26(a)(2) advisory committee's note.  Were I to permit
> Wayburn to give background testimony which is not
> contained in his report, it would undermine the ratio-
> nale for requiring the report in the first instance:
> to provide sufficient notice of an expert's testimony
> so that the opposing party may prepare for cross-
> -examination or rebuttal.  Id.

Taylor v. Evans, 94 Civ. 8425 (CSH), 1997 WL 154010 at *2

(S.D.N.Y. Apr. 1, 1997) (Haight, D.J.); accord Fund Comm. Serv.

II, Inc. v. Westpac Banking Co., 93 Civ. 8298 (KTD)(RLE), 1996 WL

469660 at *3 (S.D.N.Y. Aug. 16, 1996) (Ellis, M.J.) (Rule

37(c)(1) requires preclusion of new expert opinions and bases for

those opinions unless failure to disclose them is "harmless.");

Dimensional Sound v. Rutgers Univ., 92 Civ. 2350 (DLC), 1996 WL

11244 at *6 (S.D.N.Y. Jan. 10, 1996) (Cote, D.J.); Ferriso v.

Conway Org., 93 Civ. 7962 (KMW), 1995 WL 580197 at *2-*3

(S.D.N.Y. Oct. 3, 1995) (Wood, D.J.) (expert precluded from

testifying beyond the scope of her report).  See generally 2

Michael C. Silberberg, Edward M. Spiro & Judith L. Mogul, Civil

Practice in the Southern District of New York § 15:9 at 15-35 (2d

ed. 2010).

B.   Application of the Foregoing
     Principles to the Testimony
     <u>CIBC Seeks to Elicit from Mr. Cohen</u>

     As noted above, CIBC has submitted a letter dated
February 6, 2012 identifying all the opinions it seeks to elicit
from Mr. Cohen.  At the outset of that letter, CIBC concedes that
it will not elicit from Mr. Cohen:  (1) ultimate issues; (2)
legal conclusions; (3) statements of a party's knowledge, and (4)
facts concerning CIBC's actions, the loan or underlying property
at issue that are not already in evidence except facts of the
type ordinarily relied upon by experts (Quigley Letter at 2).  To
the extent CIBC intends to elicit facts from Mr. Cohen which are
not otherwise in evidence but are facts of the type ordinarily
relied upon by experts, it is precluded from doing so.  Although
experts are permitted to rely on certain types of facts that are
not in evidence, that does not make those facts admissible.
Fed.R.Evid. 703; 3 Stephen A. Saltzburg, Michael M. Martin &
Daniel J. Capra, <u>Federal Rules of Evidence Manual</u> § 703.02[4] at
703-8 (10th ed. 2011).  The last sentence of Fed.R.Evid. 703
provides that matters relied upon by an expert that are not in
evidence "may [be] disclose[d] to the jury only if their proba-
tive value in helping the jury evaluate the opinion substantially
outweighs their prejudicial effect."  CIBC has not, however,

22

offered any argument that would render such matters disclosable to the jury under this sentence.

In addition, Mr. Cohen is precluded from offering any testimony characterizing any of the putative breaches of the MLPA as being not material or not adverse.  The meanings of these words are straightforward and well known:  "material" means important or significant and "adverse" means unfavorable.  No evidence has been offered that these are terms of art in the financial services industry or that they have meanings in that industry that are different from their ordinary meanings. Accordingly, there is no need for expert testimony as to their meanings.  See United States v. Sanpedro, 352 F. App'x 482, 485 (2d Cir. 2009) (expert testimony appropriate where subject matter is beyond the ken of average juror); United States v. Tapia-Ortiz, 23 F.3d 738, 740 (2d Cir. 1994) (same).  In addi- tion, at his deposition, Mr. Cohen could not articulate a defini- tion for either term.

> Q:  With respect to the last sentence of this paragraph you use the phrase "materially and adversely"?
>
> A.  Yes.
>
> Q.  What does materially mean to you?
>
> A.  Materially means that something that -- that af- fects -- that would affect -- the value would affect the -- materially affect the value of the property would materially affect the ability for the -- the

23

property to function with its cash flow; so it -- it's
in the terms of what I'm talking about material and
adversely is that it -- it materially affects the
running of the property.

Q.  Okay.  And you just used the phrase "materially" in
your answer.

     What do you mean by the -- by the term "materi-
ally"?

A.  What I mean by materially is based on my experience
and my background is I have an opinion of what some-
thing is material.  I can't define material.

Q.  So it's like pornography, you know it when you see
it?

A.  Yes.

Q.  And adversely, what does that mean to you?

A.  Adversely, again, it's based on my experience and
background is -- again, I know, based on my experience,
what something adversely affects something.  I can't
define what adversely would be.

(Deposition Transcript of Brad Cohen, dated July 8, 2010, at 26-

27, annexed as Exhibit 5 to the Letter from Talcott J. Franklin,

Esq. to the undersigned, dated Nov. 9, 2010).  Given this

testimony, any testimony from Mr. Cohen opining on whether an

event was material or adverse would be a mere ipse dixit, unsup-

ported by an articulable analysis.  Gen. Elec. Co. v. Joiner, 522

U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal

Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the
ipse dixit of the expert.")

Guided by the principles set forth in Section III(A), I
shall address all the opinions CIBC has identified in the Quigley
Letter.  The single-spaced, italicized text that follows are the
descriptions of the testimony that will be offered as set forth
in the Quigley Letter.  My rulings follow immediately thereafter.
Precluded subject matters are underlined and/or set out in bold-
faced type.

> *Qualifications*
>
> *As with all expert witnesses, Mr. Cohen will testify as
> to his background, qualifications, and the basis of his
> opinions.  (Rep. at 3, including Exhibit A thereto).
> Plaintiff does not challenge Mr. Cohen's qualifications
> as an expert in commercial real estate underwriting and
> commercial mortgage-backed securitization.*

(Quigley Letter at 2).

Mr. Cohen will be permitted to testify as to his
qualifications.

> *Background of Commercial Mortgage-Backed Securities
> ("CMBS")*
>
> *Mr. Cohen initially will provide an overview of
> the CMBS industry, which, we submit, is both beyond the
> ken of the average juror and necessary to place the
> issues in dispute in the proper context.  (Rep. at
> 5-6).  More particularly, Mr. Cohen will explain how
> the CMBS industry works (i.e., how loans are
> originated, underwritten, aggregated, reviewed by
> potential investors, and then securitized).  (Rep. at*

6-9).   In this regard, Mr. Cohen will discuss the
following:

> The role and function of the key players in a CMBS
> transaction, including the borrower, the princi-
> pal/guarantor, the lender, the Issuer, the rating
> agencies, the B-piece buyers (which in this case
> was Plaintiff LNR), the trust, the master
> servicer, and special servicer (also LNR).  (Rep.
> at 6-9).

> The fact that lenders typically prepare manuals
> documenting their underwriting and due diligence
> processes, and that these manuals are generally
> guidelines, which can change over time in response
> to market conditions and as approaches to risk
> change, and that such changes are often based on
> feedback from third parties, including the rating
> agencies and CMBS investors.  (Rep. at 6).

> The creation of the securitization trust and the
> different classes or "tranches" of bonds included
> in such trusts, as well as the risks associated
> with those different tranches, including the way
> in which payments are allocated and losses are
> incurred by investors.  (Rep. at 7).

> The ratings of the bonds by the rating agencies
> and their respective levels of risk.  (Rep. at
> 7-8).

> The sale of bonds to investors-and the different
> classes of investors.  (Rep. at 8).

> The due diligence reviews generally done by inves-
> tors, including the B-piece buyers and the
> re-underwriting of loans during this process,
> including site visits and evaluation of cash
> flows, value and loss estimates.  (Rep. at 8-9).

> The "Roll-Up" process -- whereby the B-piece in-
> vestors decide which loans to keep in the pool and
> which to remove -- and the various roles of the
> participants in that process.  (Rep. at 9).

> *The role of the servicer and special servicer once the pool of loans has been sold into the securitization trust.  (Rep. at 9).*

(Quigley Letter at 2-3).

Except for the underlined material, Mr. Cohen will be permitted to testify to the forgoing background facts.  Given that this is an action for breach of contract and breach of warranty, the underlined subparagraphs are irrelevant.

*Representations and Warranties Generally*

*To properly frame his testimony, Mr. Cohen will explain the general purpose and effect of the MLPA and the representations and warranties contained therein, in accordance with customs, standards and practices of the CMBS industry.  (Rep. at 11-27).  His testimony in this section will generally include:*

> *The reason for the inclusion of the "materially and adversely" language, and its role in facilitating the smooth operation of the CMBS industry by limiting repurchase demands to cases where there are demonstrable material and adverse consequences. (Rep. at 11-12).*

> ***The fact that MLPAs are customarily negotiated among the parties*** *and along with the other offering documents inform buyers of the risks associated with investment in CMBS transactions.  (Rep. at 12).*

> *That loan sellers are not guarantors of the performance of a particular loan included in a CMBS pool and that the underlying loan documents contain carve outs for "bad acts" by the borrower.  (Rep. at 12).*

> *That B-buyers, such as Plaintiff herein, are expected to be aware of the risks associated with their investments, and that **B-buyers re-underwrite***

27

> ***the loans and perform due diligence to apprise***
> ***themselves of the risks associated with specific***
> ***loans.  (Rep. at 12).***

(Quigley Letter at 3).

Except for the underlined and bold-faced material, Mr. Cohen is permitted to testify as to the foregoing material.  The first underlined subparagraph is irrelevant and beyond Mr. Cohen's competence as an expert because it is an attempt to offer testimony concerning the unspoken intent of the parties to some hypothetical MLPA.  The second underlined subparagraph is either a pure conclusion of law or a mixed question of law and fact which is also beyond Mr. Cohen's competence.  In addition, whether a loan seller in a hypothetical transaction is a guarantor is not relevant here.  The third underlined subparagraph is also an attempt to introduce evidence concerning an unidentified party's state of mind; Mr. Cohen does not identify who has an expectation concerning the B-buyer's awareness or what his basis is for opining as to that party's state of mind.  To the extent that it is an attempt to offer evidence concerning CIBC's unspoken expectations or the expectation of a third party, it is irrelevant.  In addition, the bold-faced text is not disclosed in the Cohen Report and is, therefore, inadmissible.

28

> *Mr. Cohen will address whether CIBC complied with*
> *industry standards, customs and practices and its own*
> *internal guidelines as to each of the specific claims*
> *made by LaSalle, without opining on whether particular*
> *representations and warranties were breached.*

(Quigley Letter at 3).

The foregoing description of the testimony Mr. Cohen will offer is incomprehensible. Morever, the issue here is whether CIBC complied with its contractual obligations and representations -- not whether it complied with industry standards. Subject to the specific rulings that follow, the foregoing testimony is precluded.

> *The Effect of the Second Mortgage (Representation 6)*
>
> *Plaintiff's allegations concerning Representation 6 relate to whether a second mortgage placed on the Property by the borrower's principal, Frank Gorman, after the Loan closed but prior to when the Loan was sold, had a material and adverse effect on the Loan or the Property. In response to this allegation, Mr. Cohen will explain subordinate debt and the reasons for including a representation and warranty provision in the MLPA concerning subordinate debt and how such subordinate debt can affect a property, including:*
>
>> *How subordinate debt is typically structured with a lender and the terms (e.g., subordination) upon which it is issued. (Rep. at 13).*
>>
>> *The primary ways in which subordinate debt can affect a property, specifically its impact on cash flows and the ability to refinance the property. (Rep. at 13).*

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony. The underlined

material relates to the unspoken intent of the parties and is
pure speculation.

> *Mr. Cohen will then contrast such traditional*
> *subordinate debt with the purported second mortgage*
> *recorded by Gorman.  (Rep. at 13-14).  Mr. Cohen will*
> *discuss:*
>
>> *The second mortgage was simply a placeholder for*
>> *Gorman's sweat equity and did not involve a loan*
>> *that required periodic payments (i.e., contractor*
>> *fees allegedly owed to Gorman).  (Rep. at 13-14).*
>>
>> *Under the existing Loan documents, even if the*
>> *second mortgage was valid, the second mortgage had*
>> *very limited rights and there was no incentive for*
>> *Gorman to seek to foreclose on that mortgage.*
>> *(Rep. at 14).*
>>
>> *Gorman had expressly subordinated any debt owed to*
>> *him by the borrower to the Loan and agreed that he*
>> *would take no action against the collateral for*
>> *the Loan.  (Rep. at 14).*
>>
>> *The second mortgage was "toothless," as the term*
>> *is used in the industry.  (Rep. at 14).*
>>
>> *Any attempt by Gorman to foreclose on the second*
>> *mortgage would have triggered a provision by which*
>> *the Loan would have become full recourse to*
>> *Gorman, thereby causing him to lose the limit on*
>> *his personal liability.  (Rep. at 14).*

(Quigley Letter at 4).

Except for the underlined material, Mr. Cohen is
permitted to give the foregoing testimony.  A comparison between
traditional subordinated debt and the mortgage issued in favor of
Gorman is irrelevant given the nature of the action.  The
remaining subparagraphs are principally recitations of facts that

must be offered by witnesses with first-hand knowledge.  Mr.
Cohen's restating the testimony concerning these matters serves
no purpose.  The opinion expressed in the last underlined sub-
paragraph is admissible only if documentary evidence of the
Gorman mortgage is admitted; the opinion expressed in the last
underlined subparagraph is admissible to explain the documentary
evidence.

> *Mr. Cohen also will explain that, no matter how
> much due diligence a lender does, it cannot preclude a
> borrower from committing fraud if the borrower is
> intent on violating loan documents.  (Rep. at 15).  He
> will specifically address:*
>
> > *The use of "bad-boy" carve-outs to the non--
> > recourse provision, which make the borrower and/or
> > guarantor (Gorman) liable for the full extent of
> > the loan if fraud has been committed.  (Rep. at
> > 12, 15).*
> >
> > *The use of special purpose entities, such as the
> > borrower in this case, to ensure that the new
> > entity does not have prior debts.  (Rep. at 15).*

(Quigley Letter at 4-5).

Mr. Cohen is not permitted to give the foregoing
testimony because it is irrelevant to whether the breach of
Representation 6 adversely and materially effected the Protected
Interests.

> *Mr. Cohen will opine that the second mortgage in
> this case did not impact the Property or the Loan
> because:*

> *No monies were ever paid on the second mortgage. (Rep. at 13-14).*
>
> *The second mortgage did not use cash flows from the underlying collateral that would otherwise have been available to service the Loan. (Rep. at 13-14).*
>
> *It was placed on the Property by Gorman, the borrower's principal and not a third party lender. (Rep. at 13-14).*

(Quigley Letter at 5).

Assuming that the factual predicates for the opinion are established by admissible evidence, Mr. Cohen is permitted to give the foregoing opinion because it bears on the consequences of the mortgage issued to Gorman.

> *Mr. Cohen will further opine that the purported second mortgage did not cause the borrowing entity to file for bankruptcy. (Rep. at 14). Rather, the circumstances which led the borrower to seek bankruptcy protection existed regardless of the second mortgage. (Rep. at 14).*

(Quigley Letter at 5).

Assuming that the factual predicates for the opinion are established by competent evidence, Mr. Cohen is permitted to give the foregoing opinion because it bears on the consequences of the mortgage issued to Gorman.

> ***Mr. Cohen will also discuss the timing of Gorman's filing of the purported second mortgage as it relates to the Loan closing and CIBC's title search,*** *as well as the fact that it was <u>not industry practice to run title searches between loan closing and securitization</u>.*

32

> (Rep. at 15).  In this regard, he will address the
> following:
>
>> Investors in CMBS transactions <u>know whether title
>> searches are run between loan closing and securi-
>> tization, and they</u> have the ability to demand that
>> such searches be a requirement to closing CMBS
>> transaction.   (Rep. at 15).
>>
>> <u>There was no representation by CIBC that it ran a
>> title search between closing and securitization
>> and there is no evidence that the investors ever
>> asked CIBC to do so.   (Rep. at 15).</u>

(Quigley Letter at 5).

Except for the underlined and bold-faced material, Mr.
Cohen is permitted to give the foregoing testimony.  The bold-
faced material does not disclose any expert opinion.  Given that
this is an action for breach of contract and breach of warranty,
industry practice is irrelevant.  Mr. Cohen cannot testify to
what the plaintiff knew or what unidentified investors in hypo-
thetical CMBS transactions know.  The material in the final
paragraph is pure factual material of which Mr. Cohen would have
no first-hand knowledge.  He may cite it as a reason for is
opinion if it is established by admissible evidence.

> Mr. Cohen will explain that secondary financing is
> not uncommon in the traditional lending context and
> <u>that it is not customary for lending institutions to
> check previous loan documents to see if a secondary
> financing provision was violated.</u> (Rep. at 15).  He
> will also explain that:
>> The existence of the second mortgage was not
>> sufficient to put CIBC on notice that Gorman may

33

*have previously violated loan covenants.  (Rep. at 15).*

*<u>Once CIBC had determined that it was getting clean title (i.e., all liens and encumbrances were being discharged at closing such that the Loan was a first priority mortgage), industry custom and practice did not require any further review of the underlying documents relating to title to the Property.  (Rep. at 15).</u>*

(Quigley Letter at 5).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony.  Given that this is an action for breach of contract and breach of warranty, industry practice is irrelevant.

*<u>Finally, Mr. Cohen will explain that because the second mortgage was discharged in the bankruptcy reorganization, this resolved the second mortgage issue.</u> (Rep. at 16).*

(Quigley Letter at 5).

Mr. Cohen is not permitted to give the foregoing testimony as it is purely factual material of which he has no first-hand knowledge.

*Property Improvements (Representation 14)*

*Plaintiff's allegations as to Representation 14 relate to whether the value of the Property was impaired by any improvement that had not been completed, and if so, whether that impairment had a material and adverse effect.  <u>Mr. Cohen will explain that the purpose of including a representation and warranty concerning improvements in MLPAs is to ensure that:</u>*

34

> *The Loan was fully disbursed except for noted escrows and reserves and no future advances for improvements were required.  (Rep. at 16).*
>
> *The value of the appraisal was not impaired by any improvements that had not been made.  (Rep. at 16).*

(Quigley Letter at 6).

Mr. Cohen is precluded from testifying to the underlined material.  He cannot testify to the parties' subjective intent.  To the extent the underlined material related to the intent of third parties, it is irrelevant.

> *Mr. Cohen will also testify that:*
>
> *There were no conditions in the appraisal or the Loan documents relating to improvements on the Property.  (Rep. at 16).*
>
> *The value as set forth in the appraisal was not impaired by any improvements that were not made.  (Rep. at 16).*
>
> *The Property Condition Report did not mention any improvements that were awaiting completion and noted that overall condition of the Property was good.  (Rep. at 17).*
>
> *None of the local town planning, building or fire officials indicated improvements were incomplete.  (Rep. at 17).*
>
> *The B-buyers (Plaintiff LNR) made their own site visits before the Loan was securitized where they also noted that the condition of the Property was good, and that if they were concerned about improvements that needed to be made, they could have, and would normally, raise such concerns during the securitization process.  (Rep. at 17).*

(Quigley Letter at 6).

Mr. Cohen is precluded from offering the foregoing testimony.  At least in the absence of a showing that a document is peculiarly difficult to understand, merely reciting what is or is not in a document is not an appropriate subject of expert testimony.  The balance of the testimony summarized above merely repeats facts without any expert analysis or other information that can fairly be characterized as the product of Mr. Cohen's special training and experience.

> *Compliance with Underwriting Standards (Representation 25)*
>
> *Plaintiff's allegation concerning Representation 25 relate to whether CIBC complied with its underwriting standards and, if it did not, whether that non-- compliance had a material and adverse effect.  As an experienced commercial real estate underwriter, Mr. Cohen will testify to the <u>general approach to under- writing commercial loans for CMBS transactions</u> and review the underwriting actually done by CIBC to deter- mine whether he believes <u>that CIBC's underwriting of the Loan complied with its underwriting standards.</u> (Rep. at 20-24).  He will explain that CMBS underwrit- ing generally consists of the review of 8 categories of information: (1) Property Analysis; (2) Cash Flow Analysis; (3) Property Value; (4) Borrower Review; (5) Engineering Review; (6) Environmental Review; (7) Property Insurance Review; and (8) Title Insurance Review, and he will also discuss the various steps that lenders generally undertake with respect to these areas.  (Rep. at 20).*

(Quigley Letter at 6-7).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony. Mr. Cohen is precluded from offering the underlined opinion because it would usurp the function of the jury and relates to industry standards which are not relevant to the alleged breach of Representation 25. The issue here is CIBC's compliance with its own standards, not industry standards. As CIBC argued in support of its motion for summary judgment:

> Rep[resentation] 25 warrant[ies] compliance with the "originator's underwriting standards" -- that is, CIBC's standards -- and not some hypothetical "industry standard" or "best practice." The evidence in the record from which the Court can determine these standards is the written Underwriting Guidelines and the testimony of CIBC's experienced underwriters. LaSalle should not be permitted to modify the terms of this bargained-for warranty by injecting its own opinion of proper "industry standards" into the case.

(Memorandum of Law in Support of Defendant CIBC, Inc.'s Motion for Summary Judgment, dated Mar. 4, 2011 (Docket Item 49) at 23-24).

*Underwriting Manual*

*Initially, Mr. Cohen will discuss the use of underwriting guidelines in the CMBS industry and how lenders often adjust these guidelines over time in response to changing market conditions. (Rep. at 20). Mr. Cohen will opine that CIBC's underwriting manual is consistent with industry custom and practice regarding underwriting. (Rep. at 21).*

*With respect to CIBC's underwriting manual, Mr. Cohen will testify that:*

> *The guidelines set forth in the manual are not inflexible rules that must be adhered to in all situations regardless of the actual conditions, and that CIBC's underwriting manual, by its terms, allows CIBC to make appropriate changes to the manual and the guidelines contained therein. (Rep. at 20).*
>
> *That underwriting guidelines by their very nature have to allow for the application of judgment in the loan approval process. (Rep. at 20).*
>
> *He will also discuss the fact that the Prospectus Supplement, which was made available to all investors, specifically informed the investors, including Plaintiff, that mortgage loan sellers had developed their own set of guidelines which were generally consistent with the overview set forth in that document, but that the sellers could waive and had waived certain provisions at origination if they determined that such changes did not adversely affect the mortgage loan(s). (Rep. at 22).*

(Quigley Letter at 7).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony. To the extent Mr. Cohen seeks to offer an opinion on industry standards, his testimony is irrelevant because the issue here is CIBC's compliance with its own standards, not industry standards. Because Mr. Cohen is not an expert with respect to CIBC's own manual, his proffered testimony that CIBC's manual does not establish inflexible rules is beyond the scope of his expertise.

38

His proffered testimony concerning the Prospectus Supplement is irrelevant to the issue of CIBC's compliance with its underwriting standards.

> *Mr. Cohen will opine that CIBC followed its underwriting standards <u>as well as industry custom and practice</u>, and that in his opinion CIBC performed an appropriate level of due diligence.  (Rep. at 21)  As support for this opinion, Mr. Cohen will discuss:*
>
>> *The due diligence CIBC did on the Property (e.g., reviewing the physical condition of the Property, the current and projected financial condition of the Property, analysis of cash flows, site visits, credit checks, etc.).  (Rep. at 21).*
>>
>> *The due diligence CIBC did on the borrower/sponsor (e.g., checking the sponsor's experience and qualifications, reviewing the ownership structure of the borrower, performing credit searches, litigation and lien searches, contacting lending references and tenants, and obtaining tax returns and financial statements, among others).  (Rep. at 21).*

(Quigley Letter at 7).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony assuming that the facts are established by admissible evidence.

> *Mr. Cohen will also opine on the reasons why the Loan ultimately went into default irrespective of CIBC's underwriting, based on his review of the documents and testimony and that, despite the default, the Property had sufficient cash flow to satisfy its debt service payments.  (Rep. at 11, 21).  <u>He will also address the fact that due to credit and industry conditions in the marketplace in 2006 and 2007, investors, such as Plaintiff LNR, were buying loans</u>*

*with lower debt service coverage ratios and higher*
*loan-to-value ratios.  (Rep. at 21-22).*

> **Mr. Cohen will also explain that:**
>
> **Lenders such as CIBC received feedback from**
> **investors in earlier CMBS transactions concerning**
> **what level of risk was acceptable to investors and**
> **adjusted their underwriting parameters**
> **accordingly.  (Rep. at 20-21).**
>
> **Like all lenders, CIBC had to adjust to changing**
> **market conditions and, therefore, needed to**
> **maintain flexible underwriting requirements in**
> **order to remain competitive.  (Rep. at 22).**

(Quigley Letter at 7-8).

Except for the underlined and bold-faced material, Mr.
Cohen is permitted to give the foregoing testimony.  The
underlined testimony is irrelevant to the issue of whether CIBC
breached Representation 25.  The bold-faced material is not set
forth in the Cohen Report.

*Debt Service Coverage Ratio*

> *Mr. Cohen will then go into detail to address*
> *Plaintiff's specific criticisms of CIBC's underwriting*
> *of the Loan.  For example, he will address issues*
> *implicated by Plaintiff's contention that CIBC violated*
> *its underwriting standards by not requiring that the*
> *Loan be underwritten to a debt service coverage ratio*
> *("DSCR") of 1.20x.  (Rep. at 22-23).  He will discuss*
> *that the Loan was underwritten to a 1.20x DSCR on an*
> *"as stabilized basis" using a final set of projected*
> *revenues and he will explain how:*
>
> > *CIBC calculated the DSCR, how it was disclosed to*
> > *investors, and how this calculation of the DSCR is*
> > *different from that used to calculate the DSCR for*
> > *purposes of determining whether a "seasoning*

> reserve" set aside at closing could be released. (Rep. at 22-24).
>
> *The manner in which the Loan was underwritten was disclosed to the B-buyers (including Plaintiff LNR) and to the investors as a whole-and that many pieces of information concerning CIBC's underwriting were disclosed in the Asset Summary Report and reviewed and accepted by Plaintiff LNR and the other B-buyers.  (Rep. at 22-23).*
>
> *Mr. Cohen will also discuss the fact that LNR and the other B-buyers who bought their interests in the CMBS at a discount and achieved a premium for the risk they undertook, conducted their own underwriting of the Loan and concluded that the Loan had a risk of default for a number of reasons, including a low DSCR.  (Rep. at 23-24).*

(Quigley Letter at 8).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony.  The disclosure to the B-buyers is irrelevant to the issue of whether CIBC breached Representation 25 as is the issue of whether LNR and others bought their interests at a discount.

> *Mr. Cohen will also discuss certain specifics with respect to the entire pool of loans and how a number of loans included in the pool were underwritten to a DSCR of less than 1.20x and how this demonstrates that the B-buyers likely did not consider a DSCR of less than 1.20x a deal breaker -- given the lack of evidence of any objections.  (Rep. at 24).*

(Quigley Letter at 8).

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony.  The underlined

testimony is speculation as to the mental processes of the B-buyers and is irrelevant.

> *Credit History*
>
> *Mr. Cohen will explain that CIBC obtained the Credit & Balance Sheet Certification in which it required Gorman to certify that he hadn't filed for bankruptcy in the last 20 years.  (Supp. Rep. at 3-4). He will explain that the bankruptcy search covering the past ten years that CIBC obtained from a third-party vendor was the standard search conducted by CMBS lenders.  (Supp. Rep. at 4).  Mr. Cohen will also explain that to the extent that Gorman lied on the credit history certification, this is not a failure of CIBC to follow its standards, but borrower fraud. (Supp. Rep. at 4).*
>
> *Mr. Cohen will address Gorman's prior bankruptcy by explaining general industry practices and discussing the fact that Gorman obtained numerous loans after his prior bankruptcy and before the closing of the Loan. (Supp. Rep. at 4).*

(Quigley Letter at 9).

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant. In addition, testimony concerning industry standards or practices is irrelevant for the reasons stated above.  Whether Gorman received other loans is also irrelevant to the issue of whether CIBC breached Representation 25.

*Additional Credit Checks*

> *Mr. Cohen will opine that the fact that CIBC received responses from only two of three credit references is not significant, as the two banks to which CIBC spoke had loans totaling $7.5 million, which constituted the substantial majority of the outstanding loans, and they both indicated that they would do business with Gorman again.  (Supp. Rep. at 4-5). Based on this, he will opine that CIBC did not violate its standards when it did not follow-up with the third banking reference.  (Supp. Rep. at 5).*

(Quigley Letter at 9).

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

*Other Borrower Information*

> *Mr. Cohen will testify that CIBC's underwriting standards do not impose any requirement that CIBC audit the information provided by the borrower and Gorman and that there is no requirement that CIBC check with contractors and/or trade creditors.  (Supp. Rep. at 5).*

> *Mr. Cohen will also explain that CIBC conformed with industry custom and practice and its own underwriting standards by talking with residential and commercial tenants, running checks to discover whether any mechanic's liens had been filed and dealing with such liens at closing.  (Supp. Rep. at 5).  He will also testify that there was no reason to call either of the contractors whose liens were discharged at closing to check on Gorman's payment history.  (Supp. Rep. at 5).*

(Quigley Letter at 9).

43

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn, and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

### *Analysis of Property Cashflow*

> *Mr. Cohen will opine that CIBC followed industry custom and practice and its own underwriting standards in analyzing the Property's cashflow and explain that:*
>
> > *The B-buyers (including LNR) used basically the same numbers that CIBC did with respect to the Property's projected revenues and expenses and that the main difference between the calculations was the B-buyers' stressing of the Property by using a higher vacancy rate.  (Supp. Rep. at 5).*
> >
> > *Even though the B-buyers thought the Property had a lower DSCR-they did not object, as they had the right to do, to this Loan being included in the pool.  (Supp. Rep. at 5).*

(Quigley Letter at 9-10).

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant. In addition, testimony concerning industry standards or practices is irrelevant for the reasons stated above.

*Property Type and History*

*Mr. Cohen will testify that the specifics of the Property, its location, and the lack of operating history were well documented and provided to the B-buyers, whose own analysis discussed the Property and its attendant risks. (Supp. Rep. at 5-6).*

(Quigley Letter at 10).

Mr. Cohen is precluded from giving the foregoing testimony. The foregoing testimony is contained only in the Cohen Rebuttal Report. Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant. In addition, what information was provided to the B-buyers is not relevant to the issue of whether there was a breach of Representation 25.

*Loans Paid Off at Closing*

*Mr. Cohen will opine that there was no reason for CIBC to follow up with a previous lender, the Massachusetts Housing Investment Corporation ("MHIC") after CIBC was told that Gorman was late with his last payment, as it is not uncommon for a construction loan to become delinquent as the owner waits for "take out," financing to be arranged. (Supp. Rep. at 6-7).*

*Mr. Cohen will also explain the reasons for this opinion, namely that:*

*Developers typically refinance as construction is finishing, and it is not unusual for a loan to mature while permanent financing is being arranged, especially where the lending reference states that it would do business with the borrower again. (Supp. Rep. at 4, 6).*

45

> *The lack of any enforcement action by MHIC is an*
> *indication that this was not a significant issue.*
> *(Supp. Rep. at 6).*
>
> *To the extent that Plaintiff claims that CIBC*
> *should have contacted two other lenders because they*
> *were not "fully paid off" at closing, Mr. Cohen will*
> *explain that those two "lenders" were contractors whose*
> *liens were removed at closing.  (Supp. Rep. at 6-7).*
>
> *To the extent that Plaintiff argues that there was*
> *a purported default with respect to an existing loan*
> *from Sovereign Bank, Mr. Cohen will explain that when*
> *CIBC contacted Sovereign Bank, no reference was ever*
> *made to the alleged default, and thus, CIBC could not*
> *have been expected to do more than it did.  (Supp. Rep.*
> *at 7).*
>
> *To the extent that Plaintiff claims that CIBC*
> *breached its underwriting standards by allowing the*
> *transfer of the Property from the previous owner to a*
> *new special purpose entity, Beaver Brook Village LLC,*
> *Mr. Cohen will explain that such transfers to*
> *newly-formed special purpose entities were standard in*
> *the CMBS industry and, in fact, this transfer was*
> *required by CIBC as part of the Loan closing.  (Supp.*
> *Rep. at 7).*

(Quigley Letter at 10).

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

*Enforcement of Closing Conditions*

> *Mr. Cohen will opine that the alleged failure to*
> *enforce certain closing conditions, such as the*
> *borrower signing existing month-to-month tenants to*

46

> *long-term leases, was not significant because of the Gorman's long-term relationships with these tenants and their history at the Property.  (Supp. Rep. at 7-8).*

> > *Although it may have been preferable to have the tenants sign long-terms leases, Mr. Cohen will opine that it was acceptable and reasonable under the circumstances for CIBC to ultimately agree that Gorman could use his "best efforts" to get the tenants to sign leases-as it was in Gorman's interest to have them sign such leases.  (Supp. Rep. at 7-8).*

> > *As the Property's cash flows over time were adequate to service the debt, and some of those tenants are still at the Property, Mr. Cohen will opine that allowing Gorman to use "best efforts" was not a departure from CIBC's underwriting standards.  (Supp. Rep. at 8).*

(Quigley Letter at 10-11).

Mr. Cohen is precluded from giving the foregoing testimony.  The foregoing testimony is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

> *Property Bank Statements*

> > *Regarding Plaintiff's claim that the bank statements "showed problems at the Property," Mr. Cohen will explain that it is not uncommon for smaller developers to have unsophisticated cash management systems and sometimes borrowers bounce checks, especially during the final phases of construction. (Supp. Rep. at 8).  Mr. Cohen will also explain that because the Property had not yet stabilized there was no history of stabilized expenses and revenues-making the bank statements much less important in underwriting the Loan.  (Supp. Rep. at 8).*

47

(Quigley Letter at 11).

      Mr. Cohen is precluded from giving the foregoing testimony. The foregoing testimony is contained only in the Cohen Rebuttal Report. Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

      *Interim Servicing*

      *To the extent Plaintiff contends that Gorman's attempt to obtain the release of the "seasoning reserve," which was set aside at closing, was improper and indicative of financial problems, Mr. Cohen will opine that Gorman's request was not sufficient to put the interim servicer, Midland Loan Services, or CIBC on notice of any financial problems. (Supp. Rep. at 8). Mr. Cohen will explain that borrowers often request release of reserves and no connection is drawn from such a request to the borrower's financial condition. (Supp. Rep. at 8).*

      *To the extent that Plaintiff argues that CIBC's deferral of a decision on Gorman's request was an attempt to foist a problem onto the Trust, Mr. Cohen will explain that it was common practice in the industry to reserve all decisions with respect to the collateral to the new owner when the CMBS transaction was near closing-primarily to allow the buyer of the loan to make the decisions going forward. (Supp. Rep. at 8). Mr. Cohen will explain that this is what CIBC did in this instance. (Supp. Rep. at 8).*

(Quigley Letter at 11).

      Mr. Cohen is precluded from giving the foregoing testimony. The foregoing testimony is contained only in the Cohen Rebuttal Report. Because LaSalle's expert (Hallock) has

48

been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

*Alleged Title Insurance Conflict of Interest*

> *Mr. Cohen will explain that loan sellers do not generally run title searches between loan closing and securitization.* <u>*To the extent Plaintiff contends there was a conflict of interest between Gorman and the title agent, Mr. Cohen will testify as to the lack of evidence of such a conflict and the lack of an obligation on the part of CIBC to make further inquiry.*</u> *(Supp. Rep. at 8-9).*

Except for the underlined material, Mr. Cohen is permitted to give the foregoing testimony.  The underlined material is contained only in the Cohen Rebuttal Report.  Because LaSalle's expert (Hallock) has been withdrawn and LaSalle has been precluded from offering a substitute, Cohen's rebuttal opinions are necessarily irrelevant.

(Quigley Letter at 11).

> *Damages*

> *If necessary, Mr. Cohen will opine on the alleged damages associated with a breach.  (Rep. at 25-27).  In connection with that opinion, Mr. Cohen will discuss the following:*

>> *The change in market conditions after the Loan was sold and its effect on the value of the Property. (Rep. at 25)*

>> *The effect of Plaintiff LNR's own appraisal, conducted after the borrower filed for bankruptcy, which valued the Property at $11.3 million at that time and projected that it would reach an "as stabilized" value of $12.1 million in 2008, and*

*that these values were both well above the value of the Loan.  (Rep. at 25-26).*

*Even a second appraisal obtained by LNR in 2008 valued the "as stabilized" value of the Property at more than the amount of the Loan, and that any decrease in appraised value was due to the use of an increased cap rate.  (Rep. at 26).*

*LNR's own analysis confirms that the Trust had not suffered any loss and its modification to the Loan provided a means to avoid any loss in the future. (Rep. at 26).*

*Mr. Cohen will also explain that the Loan modifications gave Plaintiff added protections and rolled any missed payments and fees and the legal fees associated with the bankruptcy into the loan principal-thus allowing Plaintiff to recover its outs of pocket expenses from the borrower.  (Rep. at 26).*

*Mr. Cohen will address the shortened maturity date and inclusion of a hard lock box to capture rents, and the priority given to debt service payments. (Rep. at 26).*

*Mr. Cohen will opine that any loss sustained in connection with the Property in the future is speculative and greatly impacted by market conditions. (Rep. at 27).  He will further discuss the uncertainty surrounding any attempt to value the Property today as compared to its value at the time  the Loan matures in 2015.  (Rep. at 27).*

*Mr. Cohen will also discuss the requirement that the Trust compile monthly reports on the performance on the loans included in the Trust (the Trustee Reports) and the duty that the Trust and the servicers have to provide accurate information.  (Rep. at 27-28).  He will point to the fact that the Trust never identified in any Trustee report prior to the filing of this lawsuit (or in any report prior to October 2010) that there were any material breaches associated with this Loan, and explain that such breaches customarily would have to be reported.  (Rep. at 27-28).*

> *Mr. Cohen will also discuss certain statistics associated with the performance of the pool as of May 2010 (e.g., total number of loans in the pool, the total number of loans and dollar amounts in special servicing, the total number in foreclosure, REO loans and loans where appraisal reductions have been taken) and note that the Loan was not one of them.  (Rep. at 28).*
>
> *Finally, Mr. Cohen will explain that because the B-piece buyer, such as Plaintiff LNR, absorbs the first loss, any reduction in value affects it first, thereby giving B-buyers an incentive to seek to avoid losses due to declines in market conditions by seeking to force loan sellers to repurchase a loan.  (Rep. at 27).*

(Quigley Letter at 12-13).

Mr. Cohen is permitted to give the foregoing testimony.

## IV.  Conclusion

Accordingly, to the extent indicated above, plaintiff's motion to preclude testimony from CIBC's expert is granted in part and denied in part.

Dated:  New York, New York
        February 14, 2012

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies transmitted to:

Patrick F. McManemin, Esq.
Suite 1700
2000 McKinney Avenue
Dallas, Texas   75201

```
Talcott J. Franklin, Esq.
Talcott Franklin P.C.
Suite 200
208 N. Market Street
Suite 200
Dallas, Texas   75202

Joseph DiBenedetto, Esq.
Christopher Paolella, Esq.
Thomas J. Quigley, Esq.
Winston & Strawn LLP
200 Park Avenue
New York, New York   10166
```